THE BARLOW BROTHERS COMPANY *vs.* ELIZA J. PARSONS.

Third Judicial District, Bridgeport, April Term, 1901.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

A woman married prior to 1877, who has not agreed to accept the provisions of the law of that date, has no power to make a valid contract of partnership with her husband, and is not liable as a surviving partner upon his decease.

Nor is she liable as surety on a bond given by her husband to protect his former partner's estate from loss or damage.

A witness cannot be contradicted in respect to an answer he may have made in response to an irrelevant inquiry.

If evidence is admitted for the purpose of affecting the credibility of a witness, the jury should be instructed as to the limited use to which it can be put, and not be left at liberty to consider it for all purposes.

Acts of an alleged agent are inadmissible against the principal, unless the latter's knowledge of the relation or of the acts claimed to have been done on his behalf, is shown.

The question of what weight should be given to the testimony of a witness is a matter for the jury. Any examination of a witness by the trial judge in such a manner as to practically impose upon the jury his own belief as to the witness's credibility is an invasion of the province of the jury, and, unless cured by the charge, is a sufficient ground for granting a new trial.

Argued April 16th—decided May 29th, 1901.

ACTION to recover moneys deposited with a private banking-house of which the defendant was claimed to be the surviving partner, brought to the Superior Court in New Haven County and tried to the jury before *George W. Wheeler, J.;* verdict and judgment for the defendant upon the first count and for the plaintiff upon the second, and appeal by each party for alleged errors in the rulings and charge of the court. *Error and new trial granted on second count only.*

The first count was for the deposits made prior to the 11th day of October, 1898, and the second for the sums deposited between that day and the 2d day of November, 1898.

The main facts in the case were these: Guernsey S. Parsons, husband of the defendant, was engaged in the business

of private banking at Waterbury from about the year 1876 to his death in 1898; at first in partnership with William Brown under the name of Brown & Parsons, afterwards in partnership with Israel Holmes, when the name was Holmes & Parsons. Mr. Holmes died February 12th, 1895. After that the business was carried on under the name of G. S. Parsons & Company, down to the time of the death of Mr. Parsons on the 11th day of October, 1898. The defendant was married to Mr. Parsons on the 14th day of October, 1858. They lived together as husband and wife till his death. They never entered into any contract for the application to them, or either of them, or to their property rights, of any of the provisions of §§ 2796, 2797, 2798 of the General Statutes.

Prior to July 2d, 1896, Mr. Parsons asked the defendant if she would allow him to use her name in connection with said business. She said she did not wish to involve her property; and being assured by him that her property would not be involved, she consented to such use. The same day Mr. Parsons prepared and caused to be published in the Waterbury papers a notice to the effect that a partnership had been formed between himself and the defendant for the transaction of a general banking business. The defendant knew of the publication. On said day the defendant signed a bond as surety for her husband, by which Mr. Parsons agreed to save the estate of Mr. Holmes from all loss, cost or expense resulting from the use by him of the said firm name of Holmes & Parsons, up to that date, and to pay all the debts of the said late firm, and to save the said estate harmless therefrom.

Mr. Parsons died on the 11th day of October, 1898. He had been sick and confined to his house for some time. His death immediately followed a surgical operation. The defendant was very greatly prostrated by his death, and thereafter for some time was unable to attend to any business or to talk about business matters. Mr. William B. Merriman married the only child of Mr. and Mrs. Parsons. They all lived together for years and until within the last six months. After Mr. Parsons death he was the only man in the family, and he did everything relating to Mrs. Parsons' business af-

fairs which she requested him to do, or which he concluded ought to be done.

The defendant and Mr. Merriman were on the 24th day of October, 1898, appointed administrators on the estate of G. S. Parsons.

On the 2d day of November, 1898, receivers were appointed on the business of G. S. Parsons & Company.

Upon the trial of the case the plaintiff called the said William P. Merriman as a witness in chief, in its behalf. Subsequently he was called by the defendant, and after he had been examined by both parties until they had finished, concerning what took place between himself and defendant in respect to the conduct of the business subsequent to Mr. Parsons' decease, was inquired of by the court as follows: " Q. Can you recall any act of yours that you haven't testified to that was done in consequence of what Mrs. Parsons told you? A. In consequence of what Mrs. Parsons told me? Q. Yes. A. No, sir; I cannot. Q. Do you mean to say that you have stated here all the conversations, or all of the subjects of conversation, you had with Mrs. Parsons between the time of her husband's death and the time the receivers were appointed? A. Well, I had as little conversation as possible. Q. I didn't ask that; I asked you whether you stated here all the conversation, all the business conversations, you had with her between these two dates? A. I think I have covered it all, sir. Q. From your talk with Mrs. Parsons did she know that the business was going on after her husband's death down to the appointment of the receivers? A. Why, I suppose she must have known it. Q. From your talk with her, what was said between you, did she know it? A. From the conversation I had with her? Q. From all that was said between you, did she know the business was going on? A. She must have known it. Q. Can you give any conversation that you had with her or that she had with you concerning that matter? A. No, sir. Q. Did she ask you anything about where that paper came from that you took up to her, the application for the appointment of the receivers? A. No, sir. Q. Had you mentioned the fact of the receivership to

her before? A. Before that day? Q. Yes. A. I think so; I think the day before. It was the day before. Q. That is a conversation you haven't said anything about. What was it? A. Well, I think the day before I said I didn't see how we could do anything but have receivers appointed, things were in such a condition. Q. What did she say? A. Why, I should say: why, I suppose she would say it couldn't be helped. Q. I don't care what she would say. What did she say to you? A. I would say if I could recollect what she said, but I can't. Q. Oh, the substance of it. A. Well, I should say that she said, 'I suppose there is nothing else to be done.' Q. What else did you say to her that day about the appointment of receivers? A. I might have mentioned the receivers we would like. Q. Well, what did you say, is what I am after. A. Why, I must have said— *Mr. Williams.* I object to what he must have said. Q. What you said, Mr. Merriman, or the substance of it? A. Why, that we should have Mr. Elton and Mr. Chase, if we could get them, as receivers. Q. You told Mrs. Parsons that, before the application for the receivership was made? A. I think I did; yes, sir. Q. If you could get Mr. Elton and Mr. Chase for receivers they would be the persons? A. I thought they would be proper persons. Q. What did she say to that? A. She said they were good men, certainly. Q. Anything else that she said that you remember at that time? A. No, sir; I don't recall anything. Q. Did you tell her what you had done in connection with the appointment of receivers? A. I don't understand. Q. Anything said at that time about the employment of an attorney for the purpose of conducting this matter? A. I think not, sir. Q. By you or her? A. I think not, sir. Q. Had anything been said before that time in regard to the employment of an attorney by her, or by you to her? A. Well, before the receivership? Q. Yes, sir; from the date of Mr. Parsons' death down to this time? A. I don't recall it. Q. Try and remember. A. I will try. I can't remember, sir, whether I spoke of the employment of an attorney in the matter. Q. Well, did she speak to you on that subject? A. No, sir, she certainly did not, because

she was prostrated. Q. Do you know whether any attorney consulted with her during that time? A. I am very sure that none did. Q. To your knowledge? A. No, sir, not to my knowledge. Q. You mean to say from anything she said to you in these two talks about the receivership, or anything you said to her, that she didn't know that you were going to some one to have the necessary papers drawn? A. Oh, I don't mean to say that; I think she would take that for granted. Q. Well, I am not going to take it for granted. From what she said, whether she knew what was going to be done? A. She knew that I was doing all that I could in the matter; that is all, sir. Q. From what she said? A. Well, we had so little conversation; she was in such a condition I couldn't talk to her more than absolutely necessary. Q. Well, what I am getting at is whether she knew from what was said to her or what she said to you, what you did in connection with the receivership? A. Why, I don't think she did know it. Q. You don't think you told her? A. No, I don't think that I told her. Q. You don't think she gave you at any time any instructions about the employment of an attorney? A. Why, I know she did not. Q. You don't think that you consulted her at any time about the employment of an attorney? A. No, sir."

The above is a complete transcript of all that took place on the trial regarding this matter, no objection or exception being taken during the trial.

In the finding the court states that " Mr. Merriman was a reluctant witness, and endeavored to conceal facts which might tend to establish his agency for his mother-in-law, and his acts in the conduct of this business. The record, of course, fails to show the attitude of this witness entirely, but it does, I think, show the facts stated above."

Such other facts as are necessary to understand the questions decided are stated in the opinion.

*William H. Williams* and *Stephen W. Kellogg*, for the defendant.

*Lucien F. Burpee* and *John O'Neill*, for the plaintiff.

ANDREWS, C. J.   It appears that the first count in the complaint was brought to recover the amount of certain deposits made by the plaintiff, prior to the death of Mr. G. S. Parsons, with the private banking-house of G. S. Parsons & Company.   The court instructed the jury that inasmuch as the defendant was a married woman, married before 1877, and had never entered into any contract for the application to her or to her property of the provisions of the Public Act of that year relating to the property rights of married women, the law was so that, under the averments of that count and the evidence, she could not be held liable for the amounts sought to be recovered.   We think this instruction was correct.   *Freeman's Appeal,* 68 Conn. 533, 538 ; *Kilbourn* v. *Brown,* 56 id. 149 ; *National Bank of New Eng.* v. *Smith,* 43 id. 327 ; *Smith* v. *Williams,* ibid. 409 ; *Way* v. *Peck,* 47 id. 23.   See also *Buckingham* v. *Moss,* 40 Conn. 461 ; *Langenbach* v. *Schell,* ibid. 224 ; *Donovan's Appeal,* 41 id. 551 ; *Hitchcock* v. *Kiely,* ibid. 611 ; *Gore* v. *Carl,* 47 id. 291, 292.   These authorities also show that the bond signed by the defendant, as surety for her husband, to save harmless the estate of Israel Holmes, was void as to her.

The second count was framed to recover from the defendant the amount of certain deposits made by the plaintiff with the same banking-house after the death of Mr. Parsons on October 11th, 1898, and before the 2d day of November of that year—the date when the receivers were appointed.

The court instructed the jury, among other things, as follows : " The primary question under the second count, aside from the question of the amount due, is a question of fact, whether Mrs. Parsons after her husband's death was conducting that business through herself or her agent. . . . Upon Mr. Parsons' death all restrictions upon Mrs. Parsons' control of her property, her right to contract and enter into a partnership, passed away ; she was therefore as free from control as any adult.   Thereafter, if she by herself or her agent conducted the business of G. S. Parsons & Company, and during such conduct the plaintiff deposited money as alleged, which was not repaid, the defendant is liable therefor.   It is a ques-

tion of fact, dependent upon whether Mrs. Parsons by herself or her agent was conducting the business after her husband's death, and during her conduct the deposits were made which under the second count the plaintiff seeks to recover."

The plaintiff, as a part of its case in chief, offered the said bond given to the estate of Israel Holmes, by which it was agreed to save said estate harmless. Upon objection this was excluded, together with all evidence relating to its execution and delivery. After that ruling the existence of such a bond, its execution as well as its terms, were not in the case. All such facts were, after that, irrelevant to the issue then being tried. At a later stage of the trial the defendant offered as a part of her case her own deposition, in which she had been asked in chief: "Whether or not you signed any paper or papers at any time relating to the heirs of the estate of Israel Holmes, or relating to the banking business of Holmes & Parsons?" She answered: "I do not recollect that I did." Upon cross-examination she was asked, in the same deposition: "At or about the time your husband asked you to let him use your name, did you sign any bond with your husband to the Holmes' estate, or the Holmes' executors, promising to save them from all liability of Holmes & Parsons?" She answered: "I have no recollection of it." This cross-examination was continued to some length. The substance of it was that the witness did not recollect any such bond and was unable to state positively that she did not. Upon rebuttal the plaintiffs offered said bond in evidence, to which the defendant objected, on the ground that it was immaterial and improper, and did not tend to contradict any statement of the defendant. The court admitted it in rebuttal, in contradiction of the defendant's statements. The defendant objected.

We think this was error. The existence of the bond was a fact irrelevant to the issues then being tried. A witness may not be contradicted as to any answer he may have made in respect to an irrelevant fact. 1 Greenl. on Ev. § 449. The case most frequently cited on the rule is, perhaps, *Crowley* v. *Page*, 7 Car. & P. 789, 792. In that case Baron Parke in giving the judgment said: "If the witness, on cross-exami-

nation, admits the statement imputed to him, there is no necessity of giving other evidence of it; but if he says he does not recollect, that is not an admission, and you may give evidence on the other side to prove that the witness did say what is imputed, *always supposing the statement to be relevant to the matter at issue.*" *Harrington* v. *Lincoln,* 2 Gray, 133; *Nute* v. *Nute,* 41 N. H. 60; *Colwell* v. *Warner,* 36 Conn. 224; *White* v. *Griffing,* 44 id. 437, 448; *State* v. *Smith,* 49 id. 376, 380. Besides, the bond, as against the defendant, was wholly void, and whether she remembered it or did not remember it, was an utterly indifferent matter.

Even upon the theory on which the court admitted this bond, we think there was error. The bond was admitted only for the purpose of affecting the credibility of the defendant. But the jury was not instructed in respect to this. So far as they knew the bond went into the case generally, as a part of the evidence. They had no direction that they were to receive this bond and to consider it only for the purpose of contradicting the defendant. So far as they were informed this bond was in the case as fully as if it had been admitted when first offered by the plaintiff.

The plaintiff called as a witness a Mr. Steadman, who had been the head clerk for G. S. Parsons & Company and who, with the other clerks, carried on the business after Mr. Parsons' death. He was examined at length. The plaintiff also called as a witness William B. Merriman. He was the son-in-law of the defendant, having married her only child, and lived with her (the defendant) and was administrator with her on her husband's estate. He was examined at some length. The defendant also called the said Merriman as a witness for her. He was asked, on his examination in chief, by her: "Q. Did you at any time after Mr. Parsons' death give any instructions or directions to Mr. Steadman with reference to carrying on the business in behalf of Mrs. Parsons? A. No, sir. Q. Did you within that time give him any directions in regard to carrying on the business at all? A. I don't remember now." On rebuttal the plaintiff called Mr. Steadman and inquired of him as follows: "Q. Mr. Merriman states

that he didn't give you any instructions as to the conduct of the business of that bank, a day or two after Mr. Guernsey S. Parsons' funeral. What do you say on that point?" Objected to because the inquiry was a part of plaintiff's case in chief, and was not rebuttal. The question was admitted to contradict Mr. Merriman, and for the purpose of affecting his credibility. Exception by defendant. " A. Mr. Merriman said: 'Let the business continue as it is for the present.' Q. When did he say that? A. I should say it was the Monday following Mr. Parsons' funeral."

Assuming that Mr. Merriman was the agent of the defendant, if, after the death of Mr. Parsons, he gave any directions regarding the conduct of that banking business, it was a very significant fact for the plaintiff to prove as a part of its case in chief. It was a part of its case in the opening. It was not in any sense a fact in rebuttal. *Hathaway* v. *Hemingway*, 20 Conn. 191; *Belden* v. *Allen*, 61 id. 173; *Strong* v. *Smith*, 62 id. 39, 42. As a fact in chief it was clearly inadmissible at that time, unless the court, in the exercise of its discretion, permitted it to be then proved. The court did not undertake to exercise its discretion. If this fact was admissible for the purpose of contradicting Mr. Merriman, it was the duty of the court to instruct the jury clearly as to the use that might be made of it. As it stood before the jury it was evidence proving affirmatively that Mr. Merriman did give such directions as Mr. Steadman stated. It was a manifest error in the court to leave it in that way. *Smith* v. *Phipps*, 65 Conn. 302.

After the death of Mr. Parsons, Mr. Merriman found that a Mr. Hurlburt was indebted to him for overdrafts, made during the life of Mr. Parsons, amounting to $18,600. He procured from Mr. Hurlburt a note for that amount, payable to G. S. Parsons & Company, and later a note for that amount payable to the defendant and secured by a mortgage of several pieces of land in Waterbury. This note and the mortgage were dated the 31st day of October, 1898. Receivers of G. S. Parsons & Company were appointed by the Superior Court on the 2d day of November, 1898. It appeared that the defend-

ant had no knowledge of the indebtedness of Mr. Hurlburt, of the giving by him of the notes and the mortgage, until the 13th day of January, 1899, when it was brought to her atten-·· tion by her own counsel—Stephen W. Kellogg—and that then she immediately quitclaimed the same to the receivers of G. S. Parsons & Company. As a part of their case in chief the plaintiff offered in evidence these several papers, *i. e.* the note and mortgage of Mr. Hurlburt and the quitclaim of the defendant. These were objected to by the defendant. The court admitted them to prove the allegations of the second · count.

In the absence of proof that Merriman was acting with her knowledge as her agent in the matter, or that she had knowl-edge of the transaction prior to January 13th, 1899, we think this was error.

One of the reasons of appeal is that the court erred in its examination of the witness Merriman, and in the form and substance of its examination. The examination by the court is set forth at length in the statement of the case. In con-sidering that examination in reference to the reasons of appeal, there are certain features of the case which should be borne in mind. It was a civil case, in which it was the duty of the court to hold the scale with a perfectly even beam. The only thing in dispute was a sum of money—whether or not such portion of the deposits which the plaintiff claimed to have made with the private banking-house of G. S. Parsons & Com-pany as should not be paid by the receivers of that concern, should be lost by the plaintiff or should be repaid to them by the defendant. The plaintiff could not compel the defendant to make good to it such deficiency unless it established, to the satisfaction of the jury, that the defendant was, after the death of her husband, conducting the said banking busi-ness through herself or her agent. It seems to be pretty well established that the defendant was, by the death of her hus-band, greatly broken and prostrated. She was wholly unable to attend personally to any business, and was to a great de-gree incapacitated from even talking about business. There was no claim of any agent acting for her other than the said

Merriman. The defendant had testified that Merriman was not her agent in any respect in the banking business. Merriman had denied that he was such an agent. The whole case then turned on the credit which the jury should give to Merriman. If they believed him, then their verdict could not possibly be for the plaintiff. If they disbelieved him, then their verdict might be in favor of the plaintiff. Merriman was first brought into the case as a witness by the plaintiff. By so doing it in a general sense vouched for his good character. Both parties in this case were represented in court by able and experienced counsel. Merriman, being a witness whose interests might be supposed to be adverse to the plaintiff, was subjected in chief to an examination by plaintiff's counsel very like a cross-examination. This, as appears, was by the permission of the court, and was proper so far as we can see. Afterwards Merriman was called as a witness by the defendant and testified in chief in her behalf. He was then subjected to a very long, searching, rigorous and critical cross-examination by the plaintiff's counsel. By this cross-examination the characteristics, the willingness, the intelligence, and the reticence of the witness, were pretty fully shown. It was after all this that the court undertook the examination of the witness, of which complaint is made. In this examination the questions by the court were very generally in the form of cross-examination questions. The judge seems to have taken the witness in charge and to have fallen into the form of cross-examining counsel. The comments made upon the replies of the witness seem to have the style of censure and upbraiding. The whole indicates, with painful distinctness, that the judge regarded the witness as unworthy of belief; and all this in the presence of the jury. It is undoubtedly within the authority of a trial judge to ask a question, or repeated questions, of a witness. Sometimes this might be desirable to call out some fact which the jury ought to know; and such judge may, perhaps, indicate his opinion as to the credibility of the evidence, so long as he leaves the question open to the jury. The credibility of any witness as to the weight to be given to his testimony, is a

matter wholly within the province of the jury. Any conduct by a trial judge in the examination of a witness which in effect imposes upon the jury his own belief as to the credibility of that witness, is not justifiable. Such conduct would be a departure by the judge from his own proper sphere and an invasion of the province of the jury.

We are also of the opinion that having asked these questions in the manner as shown, the judge should have carefully instructed the jury that any indication of his own opinion as to the credibility of Mr. Merriman was not binding on them. Nothing of that kind was said. There was manifest error.

In the case of *McMinn* v; *Whelan*, 27 Cal. 300, 319, the court said: "From the high and authoritative position of a judge presiding at a trial before a jury, his influence with them is of vast extent, and he has it in his power by words or actions, or both, to materially prejudice the rights and interests of one or the other of the parties. By words or conduct he may on the one hand support the character or testimony of a witness, or on the other may destroy the same, in the estimation of the jury; and thus his personal and official influence is exerted to the unfair advantage of one of the parties, with the corresponding detriment to the cause of the other."

There is error and a new trial is granted.

In this opinion the other judges concurred.