# THE STATE OF CONNECTICUT vs. HAROLD N. GUILFOYLE.

First Judicial District, Hartford, March Term, 1929

WHEELER, C. J., MALTBIE, HAINES, HINMAN AND BANKS, Js.

Argued March 6th—decided April 17th, 1929.

*John T. Robinson* and *Samuel Rosenthal*, for the appellant (the accused).

*Hugh M. Alcorn*, State's Attorney, with whom was *Harold E. Mitchell*, and, on the brief, *Donald Gaffney*, for the appellee (the State).

HINMAN, J.   The indictment charged the accused with murder in the first degree in having shot to death one Claire K. Gaudet, at Hartford, on the evening of January 18th, 1928.   Having pleaded not guilty, and so elected, he was tried by the court, com-

posed of three judges as provided by Chapter 107 of the Public Acts of 1927, and was adjudged guilty of murder in the second degree. Thereupon, he filed a motion to set aside the verdict or judgment, which was denied. The appeal is in substantial accordance with the procedure for appeals in criminal cases tried to the court as outlined in *State* v. *Frost,* 105 Conn. 326, 135 Atl. 446, and assumes the twofold aspect there indicated as open to the appellant in a criminal case so tried. It raises the general question whether, upon the evidence, the defendant could be found guilty beyond a reasonable doubt, in like manner as, in a trial to a jury, that question would be presented by appeal from denial of a motion to set aside the verdict as against the evidence. We stated in *State* v. *Frost,* pp. 331, 332, that, in criminal cases tried to the court, this motion should be dispensed with and the same purpose attained by a simple assignment of error when the appeal is taken. The appellant has pursued both methods.

In the second aspect, by analogy to the procedure on appeal from the judgment of a court in a civil case, a finding of the facts and the conclusions reached by the court therefrom, has been obtained, various corrections of this finding are sought in the regular way, and assignments of error are predicated upon failure to correct this finding, an interlocutory ruling, and the conclusions arrived at from the subordinate facts. Preliminary to a consideration of the numerous assignments of error a statement, as condensed as possible, of some of the facts found by the trial court appears to be desirable.

The defendant Guilfoyle was a veterinary employed by the United States government as an inspector engaged in eradication of bovine tuberculosis in Connecticut and, with his wife, occupied an apartment on

the second floor of a house at 691 Maple Avenue, in Hartford. The apartment consisted of four rooms—kitchen, living room, bathroom and bedroom. The kitchen is located in about the center of the apartment and is entered from a hall doorway; the living room is located to the east and the bedroom to the west of the kitchen; the bathroom is between the kitchen and the bedroom. Directly across the hall from the door leading to the Guilfoyle apartment is an apartment occupied by one Johnston, the door leading to it being at the head of the stairs. The outside front doors of the house on the first floor open into a vestibule, and a door opens inwardly from the vestibule to the hallway, from which front and rear stairways lead to the second and third floors.

Claire K. Gaudet was the wife of Maximin J. Gaudet, to whom she was married December 27th, 1921. At the time of her death she was thirty-four years old. After their marriage they lived in New Haven and a daughter was born to them in November, 1922. In 1925 they moved to Hartford where they lived until they returned to New Haven May 1st, 1927. In 1919 Mrs. Gaudet met Mrs. Way, who at that time was also unmarried, but in 1923 married Algernon S. Way. In July or August, 1926, the Ways were introduced to the Guilfoyles by a mutual friend, and a frequent interchange of visits followed. In September, 1926, the Ways introduced the Gaudets to the Guilfoyles. From the date of this introduction the three families were very friendly, frequently exchanging visits with each other, having parties together, and going on trips together. These intimate relations continued up to New Years, 1927, when, while they were all at a party at the Ways' home, Mr. Way struck Mrs. Way in the face. This was resented by Dr. Guilfoyle and Mr. Gaudet and from that time on the

Gaudets and the Guilfoyles saw very little of the Ways but sought to drop them and avoid them socially. The intimacies of the Gaudets and the Guilfoyles continued until January, 1928, and visits were frequently exchanged.

On Sunday, January 15th, 1928, the accused and his wife drove to New Haven, went to the apartment of Mr. and Mrs. Gaudet, stayed to dinner and through the evening until about 11 p.m., and, in accordance with a previous arrangement, brought Mrs. Gaudet and her small daughter back to Hartford. One purpose of Mrs. Gaudet's trip to Hartford was to testify in a lawsuit pending in the Superior Court and assigned for trial Tuesday, January 17th. On the following Wednesday morning Mr. Gaudet telephoned his wife and asked her to come home and she promised that she would do so the following morning. On Wednesday morning, the day of the homicide, the accused went to Bridgeport and spent the day there inspecting cattle. He wore a brown overcoat. Upon his return to Hartford he parked his automobile in front of the apartment house and it remained there until after the homicide. During the day he appeared to be cheerful and normal, and free from nervousness or depression.

Mrs. Gaudet and her little daughter had supper that evening with the accused and his wife in the Guilfoyle apartment. At about seven-twenty-five o'clock, as Mr. and Mrs. Way were passing the apartment house they saw Dr. Guilfoyle's car parked in the street, also observed a light in the accused's rooms, and then decided to stop in to say "hello." This was the first occasion on which the Ways, the Guilfoyles and Mrs. Gaudet had been together since New Years, 1927. After a general conversation, Mr. Way went into the living room with the Gaudet child, and Mrs. Gaudet,

Mrs. Way and Mrs. Guilfoyle washed the supper dishes. The accused served beer to every one present except the little girl, and, in addition, gave Mr. Way a glass of whiskey. The only people in the Guilfoyle apartment that evening prior to the homicide were Mr. and Mrs. Guilfoyle, Mrs. Gaudet and her daughter and Mr. and Mrs. Way.

Shortly after eight o'clock, the little girl complained of being tired, Mrs. Gaudet put a coat on her and prepared to leave. The accused thereupon went to the clothes closet in the bedroom where the brown overcoat then was and shortly afterward came out again wearing a gray overcoat which had been hanging in the same closet, and stood in the entryway between the bedroom and the kitchen with both hands in his overcoat pockets. After the little girl was made ready, Mrs. Way assisted both Mrs. Gaudet and Mrs. Guilfoyle in putting on their outer wraps. Meanwhile Mrs. Gaudet's daughter started out of the door and down the stairs and Mr. Way followed her down and out onto the sidewalk to protect her from the dangers of the street. For many years Way's left leg had been stiff and lame and his right arm was amputated near the shoulder when he was a small boy.

After the Gaudet child and Way had gone down the stairs, the accused stepped out into the hall and waited for Mrs. Gaudet and together they went down the stairs, Mrs. Gaudet in the lead and the accused following. As Mrs. Gaudet stepped from the lower step to the hallway she was shot in the back with a twenty-five caliber automatic Colt pistol purchased by the accused in Philadelphia in 1924. The bullet entered a little below the right shoulder blade and pursued a downward and forward course bearing slightly to the left. The course of the bullet showed that the fatal shot was fired from a pistol held in the right

hand and from behind and above. Mrs. Gaudet screamed and made her way to the vestibule door and later slumped down upon the floor of the vestibule. The accused continued across the hall to the south wall near the vestibule door and when first seen after the shooting was standing there, about three feet from Mrs. Gaudet. After the shooting of Mrs. Gaudet, the accused turned the weapon upon himself and fired two shots. One shot took effect in the right side of his head, passed through the muscular part of the head, cutting the optic nerve and emerged at the bridge of the nose. The bullet pursued practically a horizontal course from the point of entrance to the point of exit. The other bullet embedded itself in the north wall about six feet one inch above the floor and about four feet easterly from the bottom of the front stairs.

After the accused and Mrs. Gaudet had left the apartment, Mrs. Way and Mrs. Guilfoyle started to turn out the lights in the kitchen and bedroom. Mrs. Way went to the bedroom to turn the switch which operated the light in that room and Mrs. Guilfoyle went to the kitchen light which operated from an overhead string pull. As Mrs. Way was about to place her hand upon the switch in the bedroom she heard the first shot, and turned and followed Mrs. Guilfoyle into the hall and down the stairs. Mrs. Guilfoyle was the first person to reach the accused after the shooting. When Mrs. Way arrived he was close to the south wall near the vestibule with his right hand over his right eye. On the floor at his feet was his pistol. Mrs. Guilfoyle at once assisted the accused upstairs and into the bathroom of his apartment where she washed the wound and applied cold compresses to the right side of his head. Way and the little girl were on the sidewalk about five or six paces from the outside vestibule when the shots were fired. Upon hearing the first

shot, Way started back and before he got to the door he heard two more shots. He found Mrs. Gaudet leaning against or holding on to one side of the inner vestibule door. At that time she said, "I am shot in the back." Way immediately inquired for a telephone and went to an adjoining store and telephoned the police.

After the accused had been taken to the bathroom and while his wound was being bathed by his wife, he was told that the doctor and the police were coming. He at once arose and attempted to leave the bathroom, at the same time remarking, "They are not going to get me." In the meantime Mrs. Gaudet had been brought to the bedroom in the Guilfoyle apartment. The accused and his wife were able to converse in German and while in the bathroom and before his removal to the hospital they talked to each other in that language. After the arrival of the police and before the accused was taken to the hospital, Mrs. Way asked Mrs. Guilfoyle for the pistol. Thereupon Mrs. Guilfoyle took the pistol from her pocket and handed it to Mrs. Way, who turned it over to a police officer. While at the hospital the accused was interviewed on different occasions by several police officers or detectives. At all interviews he denied he had done the shooting and stated that he did not know who did it. Mrs. Gaudet was removed to the hospital and died about thirty-eight hours later, without giving her husband any information as to the circumstances attending the homicide.

After the police arrived, the brown overcoat, which the accused had worn to Bridgeport, was found in the closet in the bedroom and in the pocket was found a small homemade leather holster in which the accused was accustomed to carry his pistol. The accused admitted that he had the pistol and the holster with

him at Bridgeport, but said that he supposed he had left it in his automobile when he arrived home.

At the time Mrs. Gaudet was shot, there was no other person in the hall or upon the stairway except the accused and Mrs. Gaudet. The shot which killed her could not have been self-inflicted. The bullet which wounded the accused entered his head just above the zygoma or malar bone and about three-quarters of an inch in front of the anterior margin and behind the corner of the right eye, passed through the head destroying the optic nerve and emerged at the bridge of the nose. The course of the bullet from the wound of entrance to the wound of exit was at an angle of about forty-five degrees to the medial line of the head. The wound was clean cut and there was no tearing or burning of the skin. There were small superficial marks of powder around the wound which disappeared in a few days. The discharge of a pistol in contact with the flesh of a human being would probably result in a tearing and burning of the skin. Such a tearing and burning might not appear if the pistol were more than three inches away; powder marks might remain for a short time if the pistol were five, six or even eight inches away. Such marks can often be brushed off or washed off if they do not penetrate the skin.

Mr. Gaudet, in the discharge of his duties, was absent from home for a period of about three months during the fall of 1926. On November 27th, 1926, the accused purchased a wrist watch which was given to Mrs. Gaudet as a present from the accused and was upon her wrist at the time of the homicide. Her husband did not know of this gift until after her death. Mrs. Gaudet worked in a department store in Hartford from March 29th, 1926, until March 19th, 1927, and during the months of January and February, 1927, the accused, in a Ford coupe, brought her to her work on

at least three or four occasions. From March 15th, 1927, which was about six weeks before the Gaudets moved to New Haven, the accused rented a lock box in the New Haven post office, for which three keys were issued. Two of these keys were found in the pocket of the coat which Mrs. Gaudet was wearing when shot, and in January, 1928, she complained to a post-office clerk that the box was closed and it was found that it had been locked by mistake. The third key was found in the possession of the accused. The accused also had a lock box at the Wethersfield post office. During visits between the Guilfoyles and the Gaudets the accused and Mrs. Gaudet sometimes discussed travel, of which both were fond.

The court concluded that the death of Mrs. Gaudet was caused by a bullet fired by the accused, with malice aforethought and with a specific intent to kill.

Corrections of the finding sought by the appellant consist largely of additions or insertions claimed on the ground that they are undisputed or admitted facts, or that they were testified to by witnesses called by the State, and that, consequently, the State is bound by such testimony and the court should accept it. While a party is bound by the uncontradicted testimony of a witness called by him and may not impeach the character of such witness, he is not concluded by the testimony of the witness as to a particular fact but may prove the fact to be different by other competent testimony. *Olmstead* v. *Winsted Bank,* 32 Conn. 278, 287; *Barlow Bros. Co.* v. *Parsons,* 73 Conn. 696, 706, 49 Atl. 205. When evidence of different witnesses introduced by the same party is contradictory, the trier has a right to believe and accept that evidence which it finds to be most credible under all the circumstances. *McCue* v. *McCue,* 100 Conn. 448, 453, 123 Atl. 914. The operation of this principle is par-

ticularly appropriate and salutary in a criminal case, where the duty of the representative of the State dictates that the testimony of every available witness tending to aid in ascertaining the truth as to facts relevant to the inquiry be laid before the trial court, irrespective of whether it be consistent with the contentions of the prosecution. It is also especially applicable and necessary where the circumstances as to which the inquiry relates are attended by great excitement or other elements productive of differences in impressions and recollections of participants or spectators, although they honestly attempt to state the facts as they perceive or recall them. In the instant case the State claims to have presented every witness available to the State whose testimony could throw any light upon the homicide. The number appears to include all those persons who, so far as the record discloses, could have had any personal knowledge of the events immediately preceding, attending, and following the shootings, except the deceased victim, Mrs. Gaudet, and the accused and his wife, both of whom are within the protection of § 6634 of the General Statutes, from involuntary appearance as a witness. It is also obvious that the circumstances attending the homicide were such as to create, naturally and necessarily, a degree of excitement and confusion tending to impair uniformity of observation and recital even by the most candid and well-intentioned witnesses, especially as to details, apparently minor at the time although perhaps becoming of importance in later inquiries.

We now pass to a review of the reasons of appeal relating to correction of the finding. Under the first of these we think there should be added a finding that "the relations between the defendant and Mrs. Gaudet were of a friendly and affectionate nature and there was no quarrel between them or breach of their

friendly relations, prior to the shooting, observed by or known to other persons." The claim that "the three shots were fired in rapid succession at intervals of about one second each" was definitely contradicted. The same is true of the requested correction to the effect that Dr. Guilfoyle, as well as Mrs. Gaudet, proceeded from the hall into the vestibule, and that blood marks were found in the vestibule. The next two assignments (four and five) contemplate insertion of a summary of the evidence of two witnesses, Ida Roberts and one Hammer, differing in some particulars from the testimony of Way as to the same matters. As above stated, it was the exclusive province of the trial court to determine which of the conflicting versions it would believe and accept, notwithstanding all three witnesses were called by the State. The proposed findings also violate the rule that the recital of evidence and evidential matters shall be avoided. Rules, § 134 (Practice Book, p. 272); *Beach* v. *First National Bank*, 107 Conn. 1, 5, 138 Atl. 905; *Gilpatric* v. *National Surety Co.*, 95 Conn. 10, 17, 110 Atl. 545.

The testimony of a police officer as to the admission of the accused, when informed of the finding of the holster in the pocket of the brown overcoat, leaves it uncertain whether Guilfoyle meant to concede that he must have taken the pistol upstairs, instead of leaving it in his automobile, as he claimed, or referred only to the holster. However, correcting the finding to confine the express admission to the holster only, the reasonable inferences from the location of the holster and the other circumstances preclude the insertion by us of the requested finding that the pistol had been left by the accused in the automobile. A police officer (Keefe) was asked: "Did you take a dying declaration, or attempt to take a dying declaration from Mrs. Gaudet?" and answered, "Yes, sir." Upon this a finding is

sought that Mrs. Gaudet made an ante mortem statement, but it was not offered in evidence by the State. No finding of fact that an ante mortem statement had been made could be predicated upon the witness' mere statement that he took or attempted to take such a statement. That could only be determined in the first instance by the court and upon a consideration of all of the surrounding circumstances; and the court could not conclude that in fact an ante mortem statement was made without seeing or hearing the statement. Whether the fact that an attempt was made by the State to take such a statement was a relevant or material fact in the case does not appear of record.

So much of paragraph thirty-five of the draft-finding as relates to the denial by the accused that he did the shooting or knew who did is already sufficiently covered by the finding; the remainder is evidential only. It appears to be undisputed that on the evening of the shooting Mrs. Guilfoyle was taken to the police station, held on a technical charge of breach of the peace, under bonds of $10,000, and was not released for about two weeks; so much of paragraph thirty-six is added to the finding. Paragraph thirty-seven is immaterial; paragraphs forty-one and forty-two are objectionable as recitals of evidence. The requested finding that there were no powder marks about the accused's wound cannot be granted as undisputed; as we shall see, this was a vigorously contested issue.

The finding (paragraph thirty-eight) states that "when informed at the hospital that Mrs. Gaudet was going to die, the accused said 'Claire, my sweetheart, she won't die, she was not shot through the pleura.' " In connection with this, the appellant asks a finding that while the accused was in the emergency room at the hospital he heard Mrs. Gaudet talking in the adjoining room. The evidence quoted in support is no

more than an expression of opinion that the accused could have heard her, not that he actually did so. The claim that "the accused's wife had taken him to task because of his attentions to Mrs. Gaudet," finds its only substantiation in rather indefinite statements by the accused to a police officer.

The requested finding that Mr. and Mrs. Way were "resentful" because of coldness toward them on the part of the Guilfoyles and the Gaudets, is not justified by the evidence nor is it, otherwise, an admitted fact. The claim that all three shots could have been fired from the lower hall outside the stairway rests on the opinion of one witness for the defense and is irreconcilable with the finding made as to the direction from which they actually were fired.

The remaining paragraphs of the draft-finding, refusal to find which is made ground of appeal, relate to facts bearing upon a determination as to whether the wound upon the head of the accused was self-inflicted, as the trial court has found. It is sufficient for present purposes to note that some of these paragraphs are statements of evidence, others allege facts as to which the trial court has arrived at a contrary conclusion, upon conflicting evidence; none are admitted or undisputed, but emphatically the opposite.

The assignments which pertain to refusal to strike out certain brief portions of the finding require little discussion. The finding that the fatal shot was fired from a pistol held in the right hand is an admissible inference from physical facts and evidence open to acceptance by the trial court. Its only apparent materiality is as tending to eliminate Way as a possible perpetrator, a process already quite thoroughly accomplished by other facts found. The finding that the bullet passed through the muscular part of the head of the accused is stricken out as inconsistent with the

technical description of the wound, subsequently added by the trial court. That at the time Mrs. Gaudet was shot there was no other person in the hall or upon the stairway except the accused has sufficient support from evidence and inferences from the sequence of events to absolve it from elimination as found without evidence. The conclusion of the trial judges that the shooting was done with malice aforethought and with a specific intent to kill is a legally inescapable consequence, if, as the court found, the accused killed Mrs. Gaudet, without any extenuation suggested by the evidence, and with a deadly weapon—his own pistol. *State* v. *McGuire,* 84 Conn. 470, 485, 80 Atl. 761; *State* v. *Litman,* 106 Conn. 345, 138 Atl. 132.

One ruling on evidence is appealed from. Dr. Sunderland, an interne at the Hartford Hospital, was called by the State and testified that he first saw the accused in the accident room at the hospital at about nine o'clock on the evening of the shooting, and gave a general description of the location and external appearance of the wound and of the treatment applied to it. Upon cross-examination he was asked to give his opinion whether the wound was inflicted by a near shot or a far shot; the question was objected to and excluded as not germane to the direct examination. This ruling was correct. The defendant might have recalled the doctor and made him his own witness for the purpose of eliciting the sought-for opinion. *Roberts* v. *New York, N. H. & H. R. Co.,* 107 Conn. 681, 689, 142 Atl. 455; *Verdi* v. *Donahue,* 91 Conn. 448, 456, 99 Atl. 1041; *State* v. *Smith,* 49 Conn. 376, 380.

Several reasons of appeal present claims that the subordinate facts set forth in the finding do not support the conclusions that the accused shot himself and Mrs. Gaudet. As the appellant recognizes in his brief, the ultimate question raised by these assignments is

essentially the same as that presented by the two further reasons, viz: whether, on all the evidence, the trial court was justified in finding the accused guilty, beyond a reasonable doubt. In *State* v. *Frost,* 105 Conn. 326, 332, 135 Atl. 446, we indicate that where such a situation is presented, pursuit of claimed corrections of the finding will seldom be necessary or profitable, as the rights of an accused person will be fully protected by the comprehensive inquiry required by the general assignment pertaining to guilt beyond a reasonable doubt, upon all the evidence. In the present case, in deference to the insistence of the appellant, we have given careful and detailed consideration to the claims for correction, but have been unable to make changes in the subordinate facts which materially affect the support afforded by them to the ultimate and decisive conclusion. The results of this inquiry tend to illustrate and confirm the above-mentioned intimation made in the *Frost* case.

The appellant claims that "the judgment involved the conclusion that there existed no reasonable doubt as to the guilt of the defendant, whereas from all the evidence the existence of a reasonable doubt of the defendant's guilt was a logical and necessary conclusion." He is correct in his contention that in the trial of criminal cases to the court trial judges are subject to the same limitations, as to the determination of issues of fact, as a jury under similar circumstances. To warrant a judgment of guilty the evidence must be such as to establish the guilt of the accused beyond a reasonable doubt, and any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused, must prevail. But the requirement of proof beyond a reasonable doubt does not mean that the proof must be beyond a *possible* doubt, and a possible hypothesis or supposition of in-

nocence is a far different thing from a *reasonable* hypothesis. *State* v. *Gargano,* 99 Conn. 103, 105, 121 Atl. 657; *State* v. *Thomas,* 105 Conn. 757, 136 Atl. 475.

We have given thorough consideration to all of the evidence in order to determine whether it fails to measure up to the requirements of a judgment of guilty in any of the several respects contended by the appellant. One of these is that no motive on the part of the accused for shooting Mrs. Gaudet was shown. "Proof of motive is never necessary to support a conclusion of guilt otherwise sufficiently established, however significant its presence or absence, or its sufficiency, may be as bearing upon the issue of guilt or innocence." *State* v. *Pisano,* 107 Conn. 630, 632, 141 Atl. 660; *State* v. *Rathburn,* 74 Conn. 524, 529, 51 Atl. 540. It is also claimed that a motive existed on the part of other persons who had opportunity to commit the crime, but we find nothing in the evidence to establish any situation which might reasonably be regarded as constituting an incentive to murder Mrs. Gaudet, on the part of the wife of the accused, or Mr. or Mrs. Way, to whom, the argument discloses, this claim has reference. The element of opportunity must also be taken into account in this connection. The claim is made that "it is quite as probable that the crime was committed by other persons present as by the accused." As we have seen, the court found that, at the time Mrs. Gaudet was shot, there was no other person in the hall or upon the stairway except the accused. The evidence as to the situation and movements of the various persons abundantly justifies the court in so holding, indeed it is difficult to see how it reasonably could have found otherwise. Mrs. Way's testimony, which the court could and it appears did credit, placed both herself and Mrs. Guilfoyle elsewhere, at the time the shots were fired. Mrs. Johnston, the tenant of the

adjoining apartment, testified that after she heard the shots she walked across the room, about fifteen steps, opened the hall door, and saw Mrs. Guilfoyle walking downstairs and then only about half way down, and another woman (Mrs. Way) back of her. No evidence places Way in the hallway at the time or affords any reasonable intimation to that effect, while his own testimony, that he was outside on the walk, might be, and apparently was, accepted. That the pistol used was the property of the accused is not questioned. In view of the finding of the holster in his overcoat pocket, the uncontradicted evidence as to his movements before starting downstairs, and the location of the pistol when first seen after the shootings, choice is not difficult as between an inference that the accused possessed and used it and one that he left it in his automobile and it was abstracted and used by Way or some other person.

Complaint is made, here as well as in connection with corrections of the finding, that the trial court has accepted certain evidence offered by the State in preference to differing testimony on the same point given by another witness or witnesses also called by the State. The right of the court, in such a situation, to accept that evidence which it finds most credible has already been referred to.

A contention strenuously pressed by the appellant is as to the existence of a reasonable doubt that the wound sustained by the accused was self-inflicted. The conflict of evidence upon this point centered principally upon the appearance of the wound, as bearing upon the question whether the shot was fired from a distance sufficiently near the point of entrance so that it could have been held and fired by the accused. The evidence was uncontradicted that immediately after the shooting Mrs. Guilfoyle bathed the wound with a

Turkish towel and applied wet cloths to it. After Guilfoyle arrived at the hospital Dr. Sunderland further cleaned the wound and applied a boric ointment dressing. He testified that the wound was clean, with no tearing, burning, or tattooing of the flesh and no powder marks that he saw. On the other hand, Dr. Heyman, who renewed the dressing the next morning, testified that then while there was no branding of the skin or burning, he observed what he thought were small superficial grains of powder, around the wound, which he could scratch off with a finger nail, and which disappeared the third or fourth day, although he was not certain that they were powder marks because they were partly dissolved by the boric ointment put on previously.

As to the effect of varying distances between the muzzle of the weapon and the wound of entrance upon the appearance of the latter as to the presence of powder marks and other manifestations, there was a decided conflict of evidence. Expert testimony on this point was the only evidence offered by the accused, aside from evidence as to his good character.

One of the experts (Fitzgerald) called by the State testified that a twenty-five caliber Colt automatic cartridge "will leave a mark up to eight inches, and in some cases will leave little spots of powder between eight and twelve inches, but they will brush out. Even at five or six inches, in a great many cases, whatever would be left might brush off." Another (Capt. Jones) testified that "up to six inches we get smudge; when you get away about an inch you begin to get ingraining of the residue of the powder on paper; on skin, I have made experiments up to ten inches, and where they were dented into the skin they could be rubbed out as far as ten inches." Asked whether, if a pistol be held seven to ten inches away when fired, the

dressing of the wound would be likely to eliminate the powder marks, he answered in the affirmative. Dr. Prince, called by the defense, stated that he saw the wound on January 20th and there were no powder marks. On cross-examination, while maintaining that powder particles imbedded in the skin would not disappear in two days, he conceded that superficial particles might. Another (Dr. Worthen) testified, from experiments made by him, in substance, that shots from as distant as nine and ten inches made powder marks which could not be washed off, and gave an opinion, based on Dr. Sunderland's description of the accused's wound, that it was not self-inflicted. A third (Col. Jones) gave a similar opinion, and stated, as to powder marks, that tattoo marks which remain, will be made up to a maximum of twelve inches. Dr. Norris, a gunshot expert called by the State in rebuttal, stated, in substance, that imbedded powder grains are to be expected up to six inches from the wound of entrance, but above six inches a twenty-five caliber smokeless automatic pistol shot will leave very little; also that where there is hair or beard it is difficult to determine, on superficial examination, whether powder grains are present.

There was also some difference of opinion evidence as to at what distance from the head, considering the angle of the wound from entrance to exit and the other elements involved, the accused could have held, aimed, and discharged the pistol. However, as to the entire proposition there was abundant evidence, if accepted by the court as against such contradictions thereof as existed, as their finding indicates that they did, together with numerous undisputed circumstances, and the legitimate inferences to be drawn therefrom, to fully justify, beyond a reasonable doubt, a conclusion that the wound was self-inflicted.

We do not deem it necessary to prolong discussion of the evidence and facts, beyond what has already been said, to demonstrate that a like determination must be reached as to the further ultimate and decisive conclusion that the shot which killed Mrs. Gaudet was fired by the accused. We only add that in the weighing of evidence for decision of issues as to facts necessarily within the knowledge of the accused, the trial court was entitled to take into consideration his failure to give the court the benefit of that knowledge by testifying in his own behalf and his course in resting upon the denial of his guilt contained in his statements to the police, as introduced by the State, instead of subjecting them to the test of cross-examination. *State* v. *Colonese*, 108 Conn. 454, 143 Atl. 561.

There is no error.

In this opinion the other judges concurred.