STATE OF CONNECTICUT *vs.* JOSEPH S. SCHOFIELD.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued December 3d, 1931—decided March 8th, 1932.

*William W. Gager,* Public Defender, for the appellant (the accused).

*William B. Fitzgerald,* Assistant State's Attorney, with whom, on the brief, was *Lawrence L. Lewis,* State's Attorney, for the appellee (the State).

HAINES, J. Both counts upon which the defendant was convicted rest upon the provisions of General Statutes, § 6517, Rev. 1918, now § 6365, Rev. 1930, the applicable portions thereof being that "any . . . broker or any agent . . . who shall take, purloin, secrete, or in any way appropriate to his own use . . . any of the moneys, choses in action or property in his care or custody as such . . . broker, agent . . . or any moneys received by him for the sale of such . . . choses in action or property . . . with intent to defraud another . . . shall be fined. . . ."

The specific offense charged in the first count is that on or about November 19th, 1929, the defendant "being then and there a stockbroker and agent of Doctor L. L. Weinberg . . . did then and there unlawfully and wrongfully sell one hundred shares of New York Title and Mortgage Company, which said stock had been deposited with said Schofield as such broker and agent as security for balance due said broker and agent from said Doctor L. L. Weinberg . . . and re-

ceived therefor the sum of $4,000, and did then and there unlawfully and wrongfully take, secrete and appropriate said sum of $4,000 and said one hundred shares of stock . . . so held by said Schofield as security, to his own use, with intent then and there to defraud him, the said Doctor L. L. Weinberg," and in the second count, that about October 15th, 1929, the defendant "acting in the capacity of agent and broker, received an order from William Brown . . . directing him as such broker to purchase two hundred shares of Railroad Shares Corporation . . . for . . . $2,462.50. Said Schofield as such broker received said sum from said Brown but failed and neglected to fill the order and deliver to said Brown said two hundred shares . . . but converted and appropriated said sum of $2,462.50, lawful money of the United States to his own use, with intent to defraud said William Brown."

The State's evidence under the first count was confined to a certain specified certificate C-1198 for one hundred shares of the stock of the New York Title and Mortgage Company alleged to belong to L. L. Weinberg and the proceeds thereof, and the second count to a sum of $2462.50, lawful money of the United States, alleged to belong to William Brown, as being the subjects of embezzlement. Under this statute the essentials of proof are four in number: (1) agency of the defendant, (2) the receipt of the stock and the money, (3) the conversion or appropriation thereof to his own use, and (4) his felonious intent to defraud Weinberg and Brown. *State* v. *Henderson*, 102 Conn. 658, 660, 129 Atl. 724. The evidence necessary for a conviction under this statute must satisfy the trier beyond a reasonable doubt of the truth of the specific charges made in the information. If there be reasonably deducible from the evidence any conclusion consistent with innocence, the requisite proof of the crime

must fail. *State* v. *Guilfoyle,* 109 Conn. 124, 139, 145 Atl. 761.

The numerous assignments of error are predicated upon denials of requested changes in the finding, upon certain conclusions reached by the trial court, and the overruling of certain claims of law made by the defendant. The last two assignments are identical in character and language, each having reference to one of the two counts in the information. They challenge the decision of the trial court "that the evidence was sufficient to establish and did establish and prove the defendant's guilt . . . beyond a reasonable doubt."

Where a question of this character is to be passed upon in a case tried to a jury, the accused moves the trial court to set aside the verdict and assigns the denial of this motion as a ground of appeal. Where, as now permitted by legislative enactment, an accused elects to be tried by the court rather than by a jury, the same right to challenge the legal sufficiency of the entire evidence is accorded him by simply assigning this as a reason of appeal. *State* v. *Frost,* 105 Conn. 326, 331, 332, 135 Atl. 446.

The comprehensive character of these two grounds of appeal is such that an adequate consideration of them with the entire evidence before us will render a detailed treatment of the particular claims for changes in the finding unnecessary. *State* v. *Guilfoyle, supra,* p. 139; *State* v. *Frost, supra,* pp. 332, 333. The evidence submitted was considerable in volume and some of it complicated and technical in character. A careful study of all of it, however, discloses surprisingly few contradictions upon the essential subordinate facts. The oral evidence and the written records and papers in evidence, show that in 1929 and on the dates mentioned in the information, the defendant in his own name and as J. S. Schofield & Co., with offices

at Waterbury, was conducting a business commonly, though perhaps not with strict legal accuracy, known as that of an investment broker. The entire charge and control of the office details and of the books and records was in the hands of an office manager; there were two or three stenographers and clerks and a considerable number of outside salesmen, at one time sixteen, actively engaged in the sale of securities being marketed by the defendant. Up to the time of the general financial crash in the fall of that year, the defendant was carrying on a business of considerable magnitude. Some time between November 11th and 14th the banking department of the State took possession of the defendant's office, books and papers, and on November 21st the bank commissioner obtained an injunction forbidding the defendant from the further prosecution of his business in this State. Late in November, the defendant filed a voluntary petition in bankruptcy.

Among the many securities handled by the defendant were two stock issues, the shares of the New York Title and Mortgage Company and those of the Railroad Shares Corporation. The placing of the former was being directed by a New York concern known as the Investors Bankstocks Corporation, of which corporation the defendant was a direct representative in Waterbury and vicinity. The defendant's offices were directly connected by wire with the New York corporation offices, a Teletype machine being used for frequent communication. The stock was forwarded from the New York office to the office of the defendant from time to time as requested by the defendant and was sold by him and his salesmen at a figure fixed by the Investors Bankstocks Corporation, and without payment by the individual buyer of a commission or other

profit to the defendant. We shall later consider the handling of the Railroad Shares Corporation stock.

To the time his business was closed up by the injunction, the defendant had received from the Investors Bankstocks Corporation, four hundred and thirty shares of the stock of the New York Title and Mortgage Company. Of this total he had sold to customers, including Weinberg, two hundred and five shares, but of this amount Weinberg's order for one hundred shares and that of Irving Pasternak for ten shares, had not been filled, so the defendant had on hand in his office three hundred and thirty-five shares of the stock and all this was represented by certificates in "street form," that is, negotiable, passing from hand to hand as occasion required and not marked as the property of any specific person. They bore no name of any customer of the defendant and were in no way definitely allocated to or ear-marked for any customer. In making delivery to fill a customer's order, any certificate of the correct denomination was used. All these shares, and some other securities in the possession of the defendant, had been posted as collateral for certain loans obtained by the defendant from the Capitol National Bank and Trust Company in Hartford. About November 18th the value of securities in general fell very sharply and on that date the Capitol National Bank and Trust Company wired the defendant that they were about to sell out sufficient of the collateral to liquidate his loans. He was in New York and could not reach the bank until the morning of the 19th, at which time he found the bank had sold all his New York Title and Mortgage Company stock except one hundred and ten shares, making no discrimination as to particular certificates sold or retained. The loans being liquidated, the bank returned to the defendant the collateral which had not

been sold. Included in this was a certificate for ten shares which had been marked by someone "Pasternak" and another certificate for one hundred shares in street form and unmarked in any way, No. C-1198. The market value of securities, including that of the New York Title and Mortgage Company, continuing to fall rapidly, the defendant, after consulting with the bank authorities, directed a sale of this one hundred-share certificate, for which he received $4,000, depositing it to the credit of his account with the bank.

The books of account show that the first block of stock received by the defendant from the Investors Bankstocks Corporation, was one hundred and ten shares ordered on October 17th; that on the 18th, Weinberg purchased one hundred shares (though the testimony of Weinberg would indicate it was on the 17th) and Pasternak purchased ten shares and thereafter from time to time various blocks of stocks were received by the defendant from the Investors Bankstocks Corporation, making up the total of four hundred and thirty shares.

The defendant, as the evidence shows and the trial court in effect finds, had no detailed knowledge at the time the collateral was posted or the one-hundred-share certificate sold, as to what sales had been made of this stock, or what orders had been cancelled or filled. All these details were taken care of by the office force and salesmen employed by the defendant. He was not then informed by them that Weinberg's order had not been filled.

The account of Weinberg on the books of the defendant, containing many charges and credits, was balanced October 16th as shown by the books and check book of the defendant, save an item of $615.50 for fifty shares of Railroad Shares, which purchase seems to have been cancelled later. On the 18th he

was charged $7250 for one hundred shares New York Title and Mortgage Company stock, and credited $3700 for one hundred shares Public Utilities stock, and later $2235.75 for seventy-five shares United Founders, and thus the balance due from Weinberg to the defendant as shown by the books was $1314.25. Weinberg testified, and the defendant denied, that at one time he offered to pay this balance by selling some other stock he had, at a loss, but however the fact may be, the payment was not made and the balance remained unpaid.

In order to sustain the conclusion which was reached, it was necessary for the trial court to find under this factual situation, which corresponds in all vital respects with the finding by the trial court, that the defendant was the agent of Weinberg and in possession of a certificate C-1198 which belonged to Weinberg.

The facts do not reflect a brokerage transaction in the acquisition of this stock by Weinberg. It was over-the-counter stock, sold directly by the defendant as the owner to Weinberg at a flat price fixed by the New York corporation, from whom the defendant obtained it. The relation between Weinberg and the defendant was thus strictly a buyer and seller relation, and the transaction a debit and credit one. The defendant in selling this stock on his own behalf to Weinberg was not acting as the agent of the latter, as would have been the case if, as broker, he had bought the stock for Weinberg for a commission to be paid by the latter. Weinberg had paid in part for his stock but he himself testified that he knew he was not entitled to a certificate until he had paid in full, which he had never done. The defendant was not the agent of Weinberg, as would have been the case had this been a brokerage transaction. The two relations are clearly

explained and distinguished in *Skiff* v. *Stoddard,* 63 Conn. 198, 220-222, 26 Atl. 874, and in *Schofield* v. *Jackson,* 99 Conn. 515, 518-522, 122 Atl. 98. Herein was the initial error in the State's claim and in the allegations of the information, and the same error appears in the trial court's conclusion. Weinberg remained indebted to the defendant for the balance of $1314.25 due on his purchase, and the defendant owed Weinberg one hundred shares of the New York Title and Mortgage Company's stock, deliverable when that balance was paid. Weinberg never obtained a title to the particular certificate C-1198 in question. Had Weinberg paid the balance due from him, he could not have required the defendant to deliver to him the certificate C-1198. He would have been obliged to accept any other certificate or certificates making up the one hundred shares he had purchased. *Skiff* v. *Stoddard,* 63 Conn. 198, 218, 26 Atl. 874. All the four requirements of proof of embezzlement under this statute must, therefore, fail, since a failure to meet obligations of this character by a defendant does not constitute embezzlement under this statute. It is not necessary here to discuss the obvious variance between the allegations in the first count of the complaint and the facts shown by the testimony and records.

The second count alleges the purchase of two hundred shares of Railroad Shares Corporation for $2462.50 by William Brown, and the embezzlement of that sum in "lawful money of the United States" by the defendant. This issue of stock was being marketed by a syndicate of which the Parker Company of Boston were members. The defendant had an initial option for fifty thousand shares of this stock from the Parker Company, five thousand for immediate delivery and forty-five thousand to be delivered over a period of time, the defendant being a member of the

distributing group. Though this particular option was afterward cancelled, the defendant did have what is technically known as "a position" in this stock. The price at which the stock was to be sold by the defendant distributor was fixed by the syndicate and the compensation of the defendant was to be by check from the syndicate operators, based upon the number of shares sold by the distributor. The defendant had a large number of outside salesmen actively engaged in selling this stock. One of these, Bergin, sold two hundred shares to Brown October 15th for $2462.50. Brown had previously bought, as shown by the defendant's books, various other stocks and some of these were sold and the proceeds credited to his account. The price of the Railroad Shares was deducted from this and a check given to Brown for the difference, leaving $2462.50 against which the Railroad Shares was charged. At the time the defendant's business was closed up, this stock had not been delivered to Brown. The State, making the claim that this was a brokerage transaction, attaches much importance to the fact that on the confirmation slip which was given to Brown, there was a notation of commission $12.50. The State and the trial court seem to have taken the view that this was commission paid to the defendant for buying these two hundred shares of stock for Brown, but this is an obvious error. The books of record and the testimony of the office manager show that it was merely an item of profit to Schofield included in the flat price at which the stock was sold to Brown. The book account with Brown shows a flat price of $2462.50, and under the arrangement for selling the stock and the fixing of a minimum flat price by the syndicate, it could not have been a charge to Brown for Schofield's service to him as his broker.

This sale, like that to Weinberg, was made by the

defendant direct, for stock which he in a sense owned or controlled. It was not bought by the defendant for Brown upon commission to be paid by Brown therefor, and was not a brokerage transaction, but one between vendor and vendee, creating a debit and credit relation between them. Being a purchase and sale transaction, the $2462.50 was not received by the defendant as the agent for Brown. He had received it from Brown in payment for the stock which was to be delivered later, and it became the defendant's money, leaving the latter owing two hundred shares of stock to Brown. Under these circumstances, the failure of the defendant to meet his obligation by delivering the stock to Brown before his business was closed up, cannot be embezzlement under the statute, § 6517, Rev. 1918. The vital element of the charge made in the second count is the embezzlement of $2462.50, and the proof fails to meet the legal requirements of the charge.

While the failure to prove that these two sales of stock were brokerage transactions, creating an agency, is thus fatal to the entire case, it should be added that even if the brokerage relation had been established, it remained for the State to establish a criminal intent to defraud, on the part of the defendant.

In view of the foregoing conclusion, it becomes unnecessary to discuss this feature of the case at length. We merely add that the trial court's conclusion that the acts of the defendant were done with intent to defraud Weinberg and Brown is an inference for which we can find no support in the evidence as a whole.

We are thus forced to conclude that not only does the factual situation create a reasonable hypothesis of innocence of the offense defined by § 6517, Rev. 1918, but upon the application of correct legal principles it points only to innocence, in fact.

There is error, and the cause is remanded to the Superior Court with direction to enter judgment for the defendant.

In this opinion the other judges concurred.