IN RE MICHAEL B.*
(13105)

DUPONT, C. J., and FOTI and LAVERY, Js.

Argued September 14—decision released December 13, 1994

*Paul F. Chinigo,* with whom, on the brief, was *Arthur P. Meisler,* for the appellant (respondent).

*C. Robert Satti, Sr.,* state's attorney, with whom were *Francis J. Carino,* chief state's advocate, *Sarah Steere,*

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 4166B.2, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

legal intern, and, on the brief, *Kevin T. Kane,* assistant state's attorney, for the appellee (petitioner).

DUPONT, C. J. The respondent Michael B., a juvenile, appeals from the granting of the motion by the state's advocate and the state's attorney[1] to transfer his case from juvenile matters to the adult criminal docket[2] on the charges of two counts of murder in violation of General Statutes § 53a-54a,[3] one count of capital felony in violation of General Statutes § 53a-54b (8),[4] and one count of felony murder in violation of General Statutes § 53a-54c.[5] In order to transfer the respondent's case to the adult criminal docket, the transfer court was

[1] The state's attorney was granted permission by the trial court to participate in matters related to the transfer hearing. *In re Michael B.,* 43 Conn. Sup. 38, 638 A.2d 651 (1993). That court ruled that both officials had a legitimate interest in the outcome of the transfer hearing and, therefore, both should be permitted to participate fully in the proceedings. Id. That ruling is not involved in this appeal.

[2] The motion was made pursuant to General Statutes § 46b-127, which provides in relevant part: "(a) The court shall transfer to the regular criminal docket of the superior court from the docket for juvenile matters: (1) Any child referred for the commission of a murder under sections 53a-54a to 53a-54d, inclusive, provided any such murder was committed after such child attained the age of fourteen years . . . .

"(b) No such transfer shall be valid unless, prior thereto, the court has made written findings, after a hearing, that there is probable cause to believe that the child has committed the act for which he is charged. . . ."

[3] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[4] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[5] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

required to find probable cause as to the elements of each of the crimes with which the respondent is charged.

The respondent contends that the order transferring his case to the adult criminal docket was improperly entered because there was insufficient evidence to support a finding of probable cause as to any of the crimes with which he is charged and because he was not allowed to present evidence that would rebut any finding of probable cause. At stake is whether the respondent will be tried as though he were an adult at the time of the commission of the crimes, thereby becoming susceptible to the penalties prescribed by the statutes he allegedly violated.[6] On the date of the alleged offenses, the respondent was more than fourteen years old and less than sixteen years old.[7]

We affirm the transfer court's rulings that probable cause existed to believe the respondent committed all of the crimes with which he is charged, and that the respondent's proffered evidence was properly excluded.

The facts surrounding the crimes are set out in the concise and clear memorandum of the transfer court. John Cluny, the husband of the victim Elaine Cluny and the father of the victim David Cluny, called the Norwich police at approximately 5:25 p.m. on May 24, 1993, to report that he had found the victims' bodies in a bedroom of the family's home. Approximately eight hours later, the respondent was apprehended in a vehicle

---

[6] Adult defendants found guilty of capital felony charges under General Statutes § 53a-54b can receive the death penalty under General Statutes § 53a-46a. The fact that the respondent was under the age of eighteen at the time he allegedly committed the murders would be a mitigating factor preventing the imposition of the death penalty. General Statutes § 53a-46a (g) (1).

[7] The respondent was born on March 21, 1978. The alleged offenses took place on May 24, 1993.

owned by Elaine Cluny. The case against the respondent is circumstantial in nature.[8]

The circumstantial evidence included certain facts. The respondent and David Cluny were friends. They played together, spent time at each other's homes, went to school together and rode the same school bus. The respondent was aware of the fact that John Cluny kept firearms in his home, and the respondent had in the past fired certain of those weapons on the Cluny property with John Cluny's permission.

On May 24, 1993, David Cluny attended school, but the respondent did not. One witness, a neighbor, reported seeing someone riding a bicycle during the morning hours in the vicinity of the Cluny home.[9] The neighbor's description of the rider was consistent with a description of the respondent, and her description of his clothing was consistent with the clothes that the respondent was wearing at the time of his subsequent apprehension. A fellow student at the respondent's school identified a photograph of a bicycle found parked within the Cluny residence as being of a bicycle belonging to the respondent. The bicycle in the photograph was consistent with the description of the bicycle given by the neighbor.

During the late morning and early afternoon of May 24, 1993, none of the three Clunys was seen near the residence. Gunshots were heard at various times during that period.

The driver of the school bus that both David Cluny and the respondent took to school reported that she dropped off David after school at approximately 2:30 p.m.,

[8] There were no eyewitnesses to the killing of Elaine and David Cluny, and the state offered no inculpatory statements by the respondent.

[9] The neighbor's testimony at the transfer hearing indicates that she did not personally know the respondent.

that the respondent was not on the bus that day, and that the Cluny dog was not there to greet David when he exited the bus, as it usually was.

Several witnesses testified that Elaine Cluny, a teacher at Griswold High School in Jewett City, left the high school at the same time she usually did, approximately 2:50 p.m. Elaine Cluny was expected to attend a meeting of the Norwich parking commission at 3:30 p.m. It is estimated that she arrived at home at approximately 3:05 p.m.

A phone call from a member of the Norwich parking commission at 3:38 p.m. produced no answer. Shortly thereafter, two witnesses saw Elaine Cluny's vehicle being driven erratically at a high rate of speed. It was coming from the direction of the Cluny house and was being driven by a young white male with short hair and wearing a light colored shirt.

John Cluny arrived home at approximately 3:45 p.m. He noted that his wife's car was not there, that the door to the house was not locked, which was not unusual, that the television was on, and that no one appeared to be home. He watched television, had a snack, and took a nap on the couch. Twice during the afternoon, he received telephone calls from the respondent's mother, expressing concern about the whereabouts of her son. Following the second of these calls, at approximately 5:20 p.m., he checked his son's bedroom and found the lifeless bodies of his wife and son. He immediately called the police.

The bodies were found together in David Cluny's bedroom. Each had sustained a single gunshot wound to the head, and the deputy chief medical examiner certified that the gunshot wounds were the cause of death of both victims. On the basis of the nature of the wounds, the chief medical examiner concluded that the weapon could not have been .22 or .25 caliber, but could

have been a .357 magnum or a .38 caliber weapon or, as he acknowledged on cross-examination, could have been a 9 or 10 millimeter weapon.[10] The wounds caused immediate loss of consciousness with death ensuing within a few moments. The medical examiner is of the opinion that the weapon was held at close range to both of the victims.

The police officers also found a trail of blood leading from the hallway to a bathroom. Behind the tub, they found the body of the Cluny dog, which had sustained gunshot wounds to the chest and head. Its wounds, while fatal, were not immediately so, allowing it to walk some distance to the place where its body was eventually found.

John Cluny subsequently noticed that a holster containing a Ruger .357 magnum handgun had been removed from its usual location and that the handgun and live ammunition kept in the Ruger holster gunbelt were missing. He also noticed that boxes of bullets found on the living room couch had not been there previously, that a .22 caliber rifle and a shotgun had been moved from their usual locations to David's room, and that the boxes in which he kept his handguns had been tampered with. He also noted bullet holes in a canoe in the backyard that had not been there previously, bullet holes in the window of his van, and bullet holes in his son's bedroom and the master bedroom. In addition, he discovered that although his wife's briefcase was in its usual place on the dining room table, her key ring was not there.

Following the issuance of a police alert on the Cluny vehicle, the respondent was eventually spotted in that vehicle, followed, and then stopped at approximately 1:30 a.m. Subsequent scientific testing revealed gun-

---

[10] The weapon used to commit those murders was never found.

shot residue on his hands and on the steering wheel of the vehicle. Human blood was found on his shirt and sock. Canine blood was found on one of his sneakers.

The respondent was subsequently arrested pursuant to a warrant signed by a judge of the Superior Court charging him with two counts of murder. He was presented to the Superior Court for juvenile matters pursuant to two petitions of alleged delinquency, the first charging him with the theft of the Cluny vehicle and the second charging him with the murders of David and Elaine Cluny. Subsequent amendment of the latter petition left the respondent charged with two counts of murder in violation of General Statutes § 53a-54a, one count of capital felony in violation of General Statutes § 53a-54b, and one count of felony murder in violation of General Statutes § 53a-54c.

At the close of the state's case, the court indicated that it was inclined to find probable cause, at least as to the charges of murder under General Statutes § 53a-54a. The respondent requested permission to introduce into evidence two documents, which were marked for identification as respondent's exhibits A and B. These were preliminary and supplemental reports from the state police forensic science laboratory. The request was denied.

The transfer court subsequently concluded in a written decision that there was probable cause as to each of the charges against the respondent. Accordingly, the court ordered the respondent's case transferred to the regular criminal docket of the Superior Court.

On appeal, this court's function is to determine whether the transfer court's decision that probable cause existed as to each of the crimes with which the respondent was charged was clearly erroneous. *In re David M.,* 29 Conn. App. 499, 503, 615 A.2d 1082 (1992), citing Practice Book § 4061 and *In re Lloyd W.,*

28 Conn. App. 608, 611, 611 A.2d 461 (1992). Probable cause exists when "the state's evidence would warrant a person of reasonable caution to believe the respondent had committed the crime with which he was charged." *In re Edwin N.*, 215 Conn. 277, 284, 575 A.2d 1016 (1990). The quantum of evidence required to establish probable cause is less than that required to establish proof beyond a reasonable doubt at trial. It is more than mere suspicion but substantially less than that required for conviction. *In re Keijam T.*, 221 Conn. 109, 115–16, 602 A.2d 967 (1992). In reviewing the evidence and the permissible inferences drawn from it to determine whether the transfer court's decision was clearly erroneous, we do so in the light most favorable to sustaining that court's determination of probable cause. *In re David M.*, supra, 503.

## I

### THE MURDER CHARGES

We first review the transfer court's finding of probable cause with regard to the two counts of murder in violation of General Statutes § 53a-54a. The state's circumstantial evidence compels the conclusion that there is probable cause to believe that the respondent caused the deaths of Elaine and David Cluny. While the respondent argues that the evidence that he caused the victims' deaths is "only" circumstantial, there is no legal distinction between direct and circumstantial evidence as far as probative force is concerned. *In re David M.*, supra, 29 Conn. App. 505. The element of intent required by General Statutes § 53a-54a can be established by circumstantial evidence or inferred from a party's statements or actions. *State* v. *Smith*, 198 Conn. 147, 154–55, 502 A.2d 874 (1985); *State* v. *DeForge*, 194 Conn. 392, 399, 480 A.2d 547 (1984). Here, the fact that both victims were shot in the head at close range with a high caliber weapon supports the finding of prob-

able cause that the person who fired those shots intended the victims' deaths. The other evidence, as previously recited, is more than sufficient to support a finding that it was the respondent who fired the shots and caused the deaths. We conclude that the evidence was sufficient to support a finding of probable cause as to the two counts of murder.

## II

### THE FELONY MURDER CHARGES

In order to sustain the court's finding of probable cause as to the felony murder charge, there must be sufficient evidence that the respondent was committing or attempting to commit one of certain enumerated crimes and "in the course of and in furtherance of" or in "flight therefrom" he caused the deaths of the victims. There is no requirement under the felony murder statute, nor was there such a requirement under common law felony murder, that the state prove that the respondent had the general intent to commit the murders. *State* v. *Kyles,* 221 Conn. 643, 666, 607 A. 2d 355 (1992). The state must simply prove all the elements of the underlying felony and then prove that the deaths were in the course of and in the furtherance of that felony, or that the deaths were caused in flight from the commission of the felony. Id. The killing of a nonparticipant "in the course of and in furtherance of [a felony] or of flight therefrom" are two methods of committing the same crime. *State* v. *Scognamiglio,* 202 Conn. 18, 22, 519 A.2d 607 (1987).

The information alleges that the underlying felony in this case is burglary. The information does not specify which degree of burglary the respondent allegedly committed, but the least serious charge of burglary is burglary in the third degree, which is defined by General Statutes § 53a-103 as "enter[ing] or remain[ing] unlawfully in a building with intent to com-

mit a crime therein." Section 53a-103 does not enumerate specific crimes that one must intend to commit in order to be guilty of burglary in the third degree. The "enters or remains unlawfully" elements of burglary in the third degree are disjunctive and a jury can convict on either element. *State* v. *Belton,* 190 Conn. 496, 502, 461 A.2d 973 (1983); *State* v. *Mankus,* 16 Conn. App. 184, 187, 547 A.2d 84, cert. denied, 210 Conn. 801, 553 A.2d 616 (1988).

Although the respondent and David Cluny were friends, there was no direct evidence that on the day of the killings the respondent was in the Cluny home with the permission of any member of the Cluny family.[11] There was circumstantial evidence, however, indicating that the respondent entered the home at a time when he knew none of the Clunys was in it. Although there was no direct evidence that at the time of his unlawful entry into the Cluny home the respondent intended to commit a crime therein, there was circumstantial evidence that the respondent did formulate such an intent during the period of time that he unlawfully remained in the home.

There was also sufficient evidence to conclude that there was probable cause to believe that at some time while unlawfully remaining in the Cluny home, the respondent intentionally shot the Cluny dog, an act that would constitute the crime of cruelty to animals under General Statutes § 53-247, and that he committed the crime of criminal mischief in violation of General Statutes § 53a-117 by causing the bullet holes in the bedrooms. Finally, there is the circumstantial evidence that the respondent took Elaine Cluny's car keys and the direct evidence that he used her car without permission in violation of General Statutes § 53a-119b.

[11] The transfer court noted that, at a minimum, the respondent was trespassing.

He might also have formulated the intent to commit larceny of a motor vehicle, the value of which exceeds $10,000, in violation of General Statutes § 53a-122.

The respondent argues that there is no evidence that he formulated the intention to commit any criminal acts prior to his alleged murder of the two victims. Evidence was introduced, however, from which it could be inferred that criminal acts had been committed prior to the murders. It could be inferred that the respondent entered the Cluny home sometime in the late morning, that he fired shots in it sometime in the late morning or early afternoon, and that he had already shot the Cluny dog by the time David Cluny arrived on the school bus. It was, therefore, proper for the transfer court to conclude that at some time while the respondent was in the Cluny home, he formulated the intention to commit a variety of crimes involving weapons, ammunition, car keys and an automobile.

We now turn to the issue of whether the killings of David and Elaine Cluny occurred in the course of and in the furtherance of or in flight from the respondent's alleged burglary of the Cluny home. "In the course of" has been held to denote a temporal limitation. *State* v. *Young,* 191 Conn. 636, 643–44, 469 A.2d 1189 (1983). The state's evidence is sufficient to support a belief that probable cause existed to find that the murders of David and Elaine Cluny occurred after the respondent unlawfully entered the home and before he left the Cluny home in Elaine Cluny's automobile, and therefore within the temporal limitation of when the alleged burglary began and ended.

In conjunction with a finding that the killings occurred "in the course of" the burglary, there must also be evidence that the killings occurred "in furtherance of" the burglary. The case of *State* v. *Young,* supra, 191 Conn. 640–41, summarizes the history and

purpose of the "in furtherance" phrase of § 53a-54c. An issue of that case was whether the phrase "and in furtherance of such crime or of flight therefrom" imposed a requirement of mens rea in the form of a specific intent or scienter with respect to the death itself. Id., 639–40. The defendant in *Young* argued that "furtherance" meant "promotion" or "advancement" and did not imply merely a causal relationship between the underlying felony and the death. Id., 640.

In rejecting this argument, the *Young* court noted that Connecticut's penal code was taken from the New York code and deviates substantially from the recommended felony murder provisions of the Model Penal Code. Id., 641. New York courts have construed the phrase "in furtherance of" to impose the requirement of a logical nexus between the felony and the homicide. Specifically, " '[m]ore than the mere coincidence to time and place . . . the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them.' " Id., quoting *People* v. *Lewis,* 111 Misc. 2d 682, 686, 444 N.Y.S.2d 1003 (1981); see also *State* v. *Gomez,* 225 Conn. 347, 622 A.2d 1014 (1993). Our Supreme Court agreed with the New York courts that the phrase "in the furtherance of" is intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts. *State* v. *Young,* supra, 191 Conn. 642. The phrase serves to exclude those murders that are committed during the course of an underlying felony but that are wholly unrelated; id., 643; but does not serve to exclude killings that were not intended. *State* v. *Cobbs,* 203 Conn. 4, 6, 522 A.2d 1229 (1987).

In order to sustain a conviction of felony murder, it is "not enough . . . that the defendant committed [the

crime] and caused the death of the victim unless the death was part of the [crime] and directly involved in it." Id., 6. In overturning the conviction in *Cobbs*, the Supreme Court noted that "the connection between [the crime] and the murder was that the two crimes involved the same participants and victim. This answer falls far short of establishing beyond a reasonable doubt that the victim was killed in the course of being robbed and in furtherance of that crime. . . . [There was] no evidence from which a trier of fact could reasonably have concluded, without resort to speculation or conjecture, that this element of the crime was established." Id., 13. The court stated that there was no convincing evidence that the underlying felony, robbery, had been committed at all. It, therefore, concluded that the victim was not killed in the course of being robbed and in furtherance of a robbery. Id.

In order for Elaine and David Cluny's deaths to be considered "in the course of and in furtherance of" the respondent's alleged burglary of their home, there must be evidence to support a burglary, as well as a nexus of logic or plan such that the killings were directly involved in the burglary, and there must be sufficient evidence that there was such a nexus without resort to speculation or conjecture.

It is very likely that in the course of committing a burglary a burglar will encounter an occupant of the dwelling, who may resist, and, in furtherance of the burglary, death of the dweller may likely result. *State v. MacFarlane*, 188 Conn. 542, 553, 450 A.2d 374 (1982). There is probable cause to believe, on the basis of the direct and circumstantial evidence and the reasonable inferences to be drawn therefrom, that there is a nexus between the two crimes because it is probable that the respondent killed David and Elaine Cluny while committing burglary.

## III

### THE CAPITAL FELONY CHARGE

General Statutes § 53a-54b defines capital felony as, inter alia, the "(8) murder of two or more persons at the same time or in the course of a single transaction." That there were two victims is clearly not at issue, and we have already established that there is sufficient evidence to sustain a finding of probable cause as to the two counts of murder. The third element is the requirement that the murders occur either at the same time or in the course of a single transaction. The state alleges that the two murders of Elaine and David Cluny constituted a single transaction. Both the state and the respondent have noted in their briefs and at oral argument that there is no Connecticut case law squarely determining the issue of when two murders have been committed in the course of a single transaction for the purposes of § 53a-54b. The transfer court found that the two murders were a single transaction because there was probable cause to believe that the respondent committed the murders as part of a series of related acts constituting a single course of conduct over a period of time that could not have lasted longer than one hour and fifteen minutes, specifically from 2:30 p.m. when David Cluny arrived home to 3:45 p.m. when John Cluny arrived home.

In its brief, the state argues that the first step in interpreting "in the course of a single transaction" is to examine the words "in the course of," which denote a temporal limitation. *State* v. *Young,* supra, 191 Conn. 636. The state then contends that two murders constitute a single transaction when they are committed within the bracket of time between the commencement and end of a sequence of events of an unlawful nature.

Here, the state argues, the unlawful events began with the respondent's entry into the Cluny home and ended with his flight from the scene.

The respondent argues that there is no forensic evidence to support the conclusion that both of the deaths occurred in the course of a single transaction, and that, given the relationship he had with David Cluny, as well as the lack of evidence as to motive, it is a reasonable conclusion that at least David Cluny's death was not intentional. The gist of this argument appears to be that without the requisite intent to murder David Cluny, the respondent could at most have committed the murder of only Elaine Cluny and the manslaughter of David Cluny, and therefore there were not two murders for the purposes of General Statutes § 53a-54b.

The reported case law better supports the state's argument. While our Supreme Court has never interpreted the phrase "in the course of" in the context of the double murder provision of the capital felony statute, it has done so for the purposes of the kidnapping provision of the capital felony statute. *State* v. *Ross,* 230 Conn. 183, 194–95, 200, 646 A.2d 1318 (1994). General Statutes § 53a-54b (5) proscribes "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety." In *Ross,* our Supreme Court held that Connecticut had jurisdiction over two murders committed in Rhode Island because the two murders were the consequences of a kidnapping that began in Connecticut. Id., 195. The reasoning behind the court's decision was that kidnapping is a continuous crime, namely, a crime that consists of a series of acts, rather than one act. Id., 196.

The reasoning in another kidnapping case, *State* v. *Gomez,* supra, 225 Conn. 347, involving felony murder rather than capital felony, is also useful in our analy-

sis. The defendant in *Gomez* was charged with felony murder, the predicate crime being kidnapping. Id., 348. The defendant in that case argued that since all the elements necessary to establish the crime of kidnapping had occurred prior to the murder, the murder could not have occurred "in the course of" and "in furtherance of" the kidnapping as required by the felony murder statute. Id., 350. The court disagreed, noting that "[k]idnapping is a continuous crime." Id., 351. The court reasoned that the victim's death occurred "in the course of" the kidnapping because that phrase "focuses on the temporal relationship between the murder and the underlying felony." Id., 352. It had previously defined "in the course of" to include "the period immediately before or after the commission of the crime." Id. The court concluded that if "in the course of" included the periods before and after the crime, the phrase must encompass the "murder in this case, which took place *during* the period of the crime itself." (Emphasis added.) Id.

The reasoning in both *State* v. *Ross,* supra, 230 Conn. 183, and *State* v. *Gomez,* supra, 225 Conn. 347, is applicable by analogy to the present case. We conclude that the respondent's alleged burglary and his alleged murders were committed along a continuum where the elements of space and time were so closely interrelated that the murders can be considered to have been committed in the course of a single transaction, namely, the burglary.

The phrase "a single transaction" has also been interpreted in other contexts, such as assault and resisting arrest, to mean a series of related but separate events occurring within a brief interval. See *State* v. *Laffin,* 155 Conn. 531, 235 A.2d 650 (1967); *State* v. *Hassett,* 155 Conn. 225, 230 A.2d 553 (1967). " '[A] crime' " means a single criminal act or transaction, out of which one or more criminal charges might arise." *State* v.

*Tyler,* 6 Conn. App. 505, 506 A.2d 562 (1986). A single transaction is a series of events with a "temporal continuity or clear connection." Id., 511.

The transfer court drew reasonable inferences from the state's evidence. Because David Cluny arrived home at 2:30 p.m. and Elaine Cluny at 3:05 p.m., and because the perpetrator had already fled by 3:45 p.m. when John Cluny arrived home, the deaths could not have been more than one hour and fifteen minutes apart. The position of the bodies indicates that Elaine Cluny had been kneeling over her son's body when she was shot, which suggests that the actual time between their deaths was less than one hour, perhaps as little as thirty-five to forty minutes, if she discovered her son's body as soon as she arrived home, or even less time than that if David Cluny was killed after 2:30 p.m. There was sufficient evidence to conclude that the two murders were committed during the course of a series of events directly related to the respondent's alleged unlawful entry of the Cluny home and his departure therefrom in the Cluny vehicle, all comprising a single transaction. See *State* v. *Velicka,* 143 Conn. 368, 122 A.2d 739 (1956).

We therefore agree with the transfer court's finding of probable cause to believe that the respondent had violated General Statutes § 53a-54b (8) because of the probability that the murder of the two victims occurred in the course of a single transaction.

## IV

### THE EVIDENTIARY CLAIM

The respondent claims that the transfer court improperly denied his request to admit evidence that he claims would rebut a finding of probable cause. The proffered evidence at issue was the preliminary and supplemental criminal reports from the state police

forensic science laboratory, which indicate that there was no evidence to establish that the human blood found on the respondent's clothing was that of either Elaine or David Cluny, and that John Cluny's hands tested positive for lead. Our analysis of challenges to the evidentiary rulings by a trial court is guided by a well settled standard of review. "It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . ." (Citations omitted; internal quotation marks omitted.) *Curry* v. *Burns,* 33 Conn. App. 65, 68, 633 A.2d 315 (1993).

Prior to 1990, the rules of evidence did not apply to hearings on transfers from the juvenile docket to the criminal docket under General Statutes § 46b-127. See *In re Ralph,* 211 Conn. 289, 307, 559 A. 2d 179 (1989). Section 46b-127 has since been amended to provide that the procedures required by General Statutes § 54-46a, the statute governing probable cause hearings on the adult criminal docket, apply to juvenile transfer hearings as well. The rules of evidence, therefore, now apply to juvenile transfer hearings. See *In re Jose M.,* 30 Conn. App. 381, 384–85, 620 A.2d 804, cert. denied, 225 Conn. 921, 625 A.2d 821 (1993).

Under § 54-46a (b), and therefore under § 46b-127, if the court finds probable cause based on the state's evidence, then the accused may make a specific offer of proof to rebut the finding of probable cause. *In re Keijam T.,* supra, 221 Conn. 126. The accused gains the right to present that evidence only "if the court determines [in its discretion] that such evidence would be sufficient to rebut the finding of probable cause." General Statutes § 54-46a (b); *In re Keijam T.,* supra, 126; *State* v. *Zaporta,* 36 Conn. App. 250, 252, 650 A.2d 582 (1994). The purpose of this procedure is to exclude

evidence that, even if believed, would not undermine the court's antecedent finding of probable cause while, at the same time, safeguarding the accused's interest in attempting to persuade the court that, despite the state's evidence, probable cause is lacking. *In re Keijam T.*, supra, 126. Here, the court ruled that the evidence sought to be offered was not sufficient to rebut its finding of probable cause as to any of the charges.

Giving the proffered items their most favorable construction, the court acknowledged the fact that the blood on the respondent's clothing was never positively identified as that of either Elaine or David Cluny, and that that might be an issue at trial. The court ruled, however, that that was not enough, in light of the state's circumstantial evidence, to rebut probable cause to believe that the respondent had committed the murders. Similarly, the court ruled that although John Cluny's hands tested positive for lead, there were no traces of barium and antimony, which would have been expected in the presence of gunshot residue. There was, however, sufficient evidence, specifically the gunshot residue on the respondent's hands and on the steering wheel of the Cluny car, to support a finding that the respondent had fired a weapon that day. The court, therefore, concluded that the evidence of lead on John Cluny's hands was insufficient to rebut the finding of probable cause as to the murder charges.

The court then ruled that with respect to the felony murder and capital felony counts, the proffered evidence did not relate to any element of those two offenses except the identity of the person who entered the Cluny home and caused the victims' deaths. The court, therefore, concluded that the proffered evidence was insufficient to rebut the state's evidence that there was probable cause to believe that that person was the respondent.

The transfer court appropriately exercised its discretion in not admitting the proffered evidence.

The order of transfer is affirmed.

In this opinion the other judges concurred.