IN RE DANIEL H.*
(AC 14912)

O'Connell, C. J., and Foti and Schaller, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 4166B.2, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Reporter of Judicial Decisions

Argued September 23—officially released December 23, 1997

*Robert P. Pickering*, with whom, on the brief, was *F. Mac Buckley*, for the appellant (respondent).

*Eileen McCarthy Geel*, deputy assistant state's attorney, with whom were *Francis J. Carino*, chief juvenile prosecutor, and, on the brief, *Kevin Kane*, state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The juvenile respondent appeals from the order of the Superior Court for Juvenile Matters transferring his case to the regular criminal docket of the Superior Court on the basis of a finding of probable cause that he committed murder in violation of General Statutes § 53a-54a.[1] The respondent claims that the

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

court improperly ordered the transfer because (1) the evidence was insufficient to support a finding of probable cause and (2) the respondent was improperly prevented from producing evidence to rebut the court's finding of probable cause at the transfer hearing. We affirm the order of transfer.

This case arises out of an incident on June 26, 1994, when Michael Tomassi, a passenger in a car that was traveling past the respondent's house, was fatally shot. The respondent was fifteen years old when the shooting occurred and, therefore, a "child" whose offenses would ordinarily be treated as juvenile matters. General Statutes §§ 46b-120 and 46b-121.

After his arrest, the respondent was presented to the Superior Court for Juvenile Matters pursuant to an amended petition to adjudicate him a delinquent child, which charged him with committing two counts of assault in the first degree in violation of General Statutes § 53a-59, unlawful discharge of a firearm in violation of General Statutes § 53-203, reckless endangerment in the first degree in violation of General Statutes § 53a-63, and murder in violation of General Statutes § 53a-54a. The state's advocate moved to transfer the respondent from the juvenile docket to the regular criminal docket in accordance with General Statutes (Rev. to 1995) § 46b-127.[2] Following a hearing, the court granted the state's motion, finding that there was probable cause to believe that the respondent had committed the murder of Tomassi.

---

[2] General Statutes (Rev. to 1995) § 46b-127 provides in relevant part: "(a) The court shall transfer to the regular criminal docket of the superior court from the docket for juvenile matters: (1) Any child referred for the commission of a murder under sections 53a-54a to 53a-54d, inclusive, provided any such murder was committed after such child attained the age of fourteen years . . . .

"(b) No such transfer shall be valid unless, prior thereto, the court has made written findings, after a hearing, that there is probable cause to believe that the child has committed the act for which he is charged. . . ."

The trial court's finding of probable cause was based on the following evidence presented at the transfer hearing. At approximately 11 p.m. on June 26, 1994, two teenage males drove to the parking lot of a convenience store in Colchester, where they met six male friends who arrived in a second car. The two groups of teenagers learned that several of them had seen a red Subaru driving slowly past their homes that evening, and they agreed to look for the vehicle. Four of them got into one car while four others rode in a second vehicle.

Shortly after leaving the store, the occupants in both vehicles saw the Subaru parked at a gas station. The driver of the Subaru had been using the public telephone while his passengers, including the respondent and his brother, waited in the car. The respondent's brother noticed several of the passengers of the other vehicles get out of their cars and approach the Subaru. He stated that they appeared to be angry. He alerted the driver, who quickly got back into the Subaru and drove away. The passengers in the Subaru motioned to the other vehicles to follow them.

All three cars participated in a high speed chase on the back roads of Colchester for approximately five to ten minutes. During the chase, the passengers of the Subaru threw bottles at the other vehicles. The Subaru finally was driven into the driveway of the respondent's family residence. The other teens drove past the house before turning around.

After the four occupants of the Subaru entered the respondent's house, all but the respondent went to the kitchen and waited with the respondent's mother. The respondent retrieved a twelve gauge shotgun from the house, which he had loaded the previous evening, and walked back out to the road to wait for the vehicles to return. About twenty seconds later, the respondent's brother followed the respondent out to the road to serve

as a lookout. As the vehicles slowly approached the residence, the front seat passenger in one of the vehicles clearly saw the respondent standing by the side of the road holding a shotgun. The respondent's brother heard the occupants of the second vehicle shout, "shoot him," "here it comes," and "are you ready?" and then he heard a shot.

Although the respondent's brother had seen the respondent pointing the gun at the second vehicle, he did not actually see him fire the shot. He thought that the shot "came from the twelve gauge [the respondent] was holding" because he saw the respondent holding the shotgun immediately before and after the shot was fired. He also recognized the sound of the twelve gauge pump action shotgun being fired. Five seconds later, he saw the respondent fire a second shot into the air. As both cars drove away, the second vehicle passed the first, and the front seat passenger of the trailing vehicle noticed that the rear window of the other vehicle had been blown out and there was blood on the back of the headrest and around the window.

Immediately after the shooting, the respondent exclaimed "they had a gun," and proceeded to pick up the shell casings and throw them farther up onto the lawn. His brother, however, had not seen any weapons displayed by the passengers in either car. The respondent's mother then came out of the house and followed the vehicles in the Subaru to record their license plate numbers. The respondent's stepfather, who had also been inside the house, drove two of the teens to their homes. The respondent and his brother went back inside the house and waited for their parents to return.

After speeding away from the respondent's house, the vehicles were driven to the state police barracks in Colchester. Seven of the eight teenagers ran into the station and described the incident to Trooper Timothy

Nolan. One boy was wounded and bleeding from a gunshot wound to the head. Tomassi, who was suffering from severe gunshot wounds to his neck and head, remained in one of the vehicles. Nolan provided first aid to Tomassi until medical personnel arrived at the station. Tomassi subsequently died as a result of his injuries.

When the medics arrived, Nolan and Detective Richard Wardell drove to the respondent's house to investigate the crime scene. They questioned the respondent and his brother, and the boys' mother and stepfather regarding the shooting. Nolan secured the shotgun and the shell casings, and found shotgun wadding and broken glass in front of the respondent's house. Nolan then took the respondent into custody.

I

The respondent first claims that the trial court transferred his case to the regular criminal docket on the basis of insufficient evidence. Specifically, the respondent avers that the evidence was insufficient to support the court's finding of probable cause that the respondent intended to kill Tomassi. We disagree.

Our standard of review is well settled. "On appeal, this court's function is to determine whether the transfer court's decision that probable cause existed as to each of the crimes with which the respondent was charged was clearly erroneous. . . . Probable cause exists when the state's evidence would warrant a person of reasonable caution to believe the respondent had committed the crime with which he was charged. . . . The quantum of evidence required to establish probable cause is less than that required to establish proof beyond a reasonable doubt at trial. It is more than mere suspicion but substantially less than that required for

conviction. . . . In reviewing the evidence and the permissible inferences drawn from it to determine whether the transfer court's decision was clearly erroneous, we do so in the light most favorable to sustaining that court's determination of probable cause." (Citations omitted; internal quotation marks omitted.) *In re Michael B.*, 36 Conn. App. 364, 370–71, 650 A.2d 1251 (1994).

For the trial court to transfer the respondent's case to the regular criminal docket on the basis of a finding of probable cause that the respondent murdered Tomassi, it had to find that there was probable cause to believe that the respondent killed Tomassi with the intent to do so. As to the element of intent, "[i]t is axiomatic that a [fact finder] may infer an intent to kill from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *In re Keijam T.*, 221 Conn. 109, 119, 602 A.2d 967 (1992). In the present case, the respondent's intent to kill Tomassi was evident from his actions on June 26, 1994: the respondent left the safety of his home carrying a loaded shotgun; he aimed the gun directly at the back window of the victim's car at the level of the passengers' heads; he was a proficient marksman and understood the deadliness of his weapon; and he tampered with evidence by throwing the shotgun shell casings onto his lawn. We conclude that the trial court's finding of probable cause as to the count of murder was not clearly erroneous.

II

The respondent next claims that the trial court improperly denied him the opportunity to present evidence to rebut the court's finding of probable cause on

the charge of murder. At the hearing, the respondent sought to introduce evidence demonstrating his affirmative defense of extreme emotional disturbance pursuant to General Statutes § 53a-54a (a)[3] and self-defense pursuant to § 53a-19 (a).[4] Specifically, the respondent offered to show that he and his family were repeatedly harassed at home and in public by local teenagers and that the family had become so fearful of being attacked that the respondent's mother had allowed him to keep a loaded shotgun in the house for protection.

In analyzing the respondent's claim that the trial court improperly excluded his proffered evidence, we are guided by a well settled standard of review. "It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion." (Internal quotation marks omitted.) *Curry* v. *Burns*, 33 Conn. App. 65, 68, 633 A.2d 315 (1993).

"Under § 54-46a (b) [and § 46b-127], if the court finds probable cause based on the state's evidence, 'the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered.' The accused only gains the right to present that evidence if 'the court determines that such evidence would be sufficient to rebut the finding of probable cause.' General Statutes § 54-

---

[3] General Statutes § 53a-54a (a) provides in relevant part that "in any prosecution [for murder], it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse . . . ."

[4] General Statutes § 53a-19 (a) provides in relevant part that "a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force . . . ."

46a (b). The purpose of this procedure is to protect the proceeding from evidence that, even if believed, would not undermine the court's antecedent finding of probable cause while, at the same time, safeguarding the accused's interest in attempting to persuade the court that, despite the state's evidence, based upon all the available evidence probable cause is lacking." *In re Keijam T.*, supra, 221 Conn. 126.

The respondent claims that his proffered evidence would have rebutted the court's finding of probable cause by demonstrating that he did not commit the elements of the crime of murder. The respondent made an offer of proof that he and his family had been routinely harassed and threatened. This offer was made to show that the respondent was suffering from an extreme emotional disturbance and was also acting in self-defense when he retrieved his loaded shotgun and carried it to the road. The proffered evidence, however, does not rebut the elements of murder but, rather, seeks to justify the respondent's actions on the night in question: "An affirmative defense is one that *admits* the doing of the act charged, but seeks to justify excuse or mitigate it." (Emphasis added; internal quotation marks omitted.) *State* v. *Heinz*, 1 Conn. App. 540, 547, 473 A.2d 1242, cert. denied, 194 Conn. 801, 477 A.2d 1021 (1984). While evidence that the respondent was acting under extreme emotional disturbance or in self-defense may be relevant at trial, it is not relevant for the purpose of rebutting the trial court's finding of probable cause as to the charge of murder.

Further, we note that most of the evidence that the respondent sought to introduce at the transfer hearing was already before the court.[5] We conclude that the

---

[5] At the transfer hearing, the respondent cross-examined the state's witnesses, thereby placing before the court testimonial evidence that the respondent and his family had been routinely harassed by local teenagers and that the respondent had stated that one of the passengers in the cars had a gun.

trial court appropriately exercised its discretion in not admitting the proffered evidence.

The order of transfer is affirmed.

In this opinion the other judges concurred.