STATE OF CONNECTICUT *v.* KRISTA LAFOUNTAIN
(AC 31549)

DiPentima, C. J., and Bear and Peters, Js.

Argued December 7, 2010—officially released April 12, 2011

*Adele V. Patterson*, senior assistant public defender, with whom, on the brief, was *Kent Drager*, former senior assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Krista LaFountain, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), felony murder in violation of General Statutes § 53a-54c and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). On appeal, the defendant claims that (1) there was insufficient evidence adduced at trial to sustain her conviction of (a) first degree assault on a theory of *Pinkerton*[1]

---

[1] See *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). "In *Pinkerton* v. *United States*, supra, [647–48], the United States Supreme Court concluded that a conspirator may be held vicariously liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. We consistently have recognized *Pinkerton* liability as an established aspect of our criminal conspiracy jurisprudence." *State* v. *Coward*, 292 Conn. 296, 299 n.6, 972 A.2d 691 (2009).

liability and (b) felony murder, and (2) the prosecutor committed reversible impropriety by (a) failing to enter into evidence statements that she had given to police upon her arrest, and (b) vouching for the credibility of the state's two key witnesses and stating during final argument to the jury that their incarceration at the time of trial was punishment for their role in the alleged crimes. We disagree, and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On the night of November 30, 2006, Walter Smykla, his good friend, Jonathan Martin, and an acquaintance, Sean Bodamer, from whom the two friends had purchased cocaine, met the defendant at an E-Z Mart Gulf gasoline station in Bristol. After socializing for a while, the defendant accompanied Smykla, Martin and Bodamer to Smykla's apartment. At Smykla's apartment, the four listened to music, ingested cocaine and drank beer and brandy. The defendant generally appeared to be happy and intoxicated and was seen laughing, joking, flirting, touching, kissing and being affectionate with Bodamer.

When the cocaine had been consumed entirely, Bodamer, Smykla, Martin and the defendant sought to acquire more. The defendant proposed that they steal cocaine from some teenagers at the home of her friend, Brandy Davis, in Plymouth. The idea appealed to Bodamer, who told the defendant that he had an AK-47 at home that he wanted to get.[2] The defendant and Bodamer eventually persuaded Martin, the only one

---

[2] At trial, all of the witnesses testified that they either heard talk of or saw an "AK-47" assault rifle; however, forensic analysis later revealed the weapon in question to be a Romanian manufactured Romarm 7.62 by 39 millimeter caliber semiautomatic rifle whose design was based on the AK-47 patent. To avoid any confusion, we refer to the weapon in question as an AK-47.

at Smykla's apartment with a car, to drive them to Plymouth. Smykla, not wanting to let his good friend go alone, also agreed to go to Plymouth.

After exiting Smykla's apartment and on the way to Martin's car, the defendant told Smykla that she sought to exact revenge for having been raped the previous night at Davis' apartment. Smykla, Martin, Bodamer and the defendant then got into Martin's vehicle and went to Bodamer's residence where Bodamer retrieved an AK-47 that he put in the trunk of Martin's car. Martin then drove, while Bodamer provided him with directions to Plymouth, and the defendant provided directions to Davis' home at 2 Benedict Street in Terryville.

Once on Benedict Street, the defendant instructed Martin to stop the car, and turn off the engine and lights. Bodamer and the defendant exited the vehicle, and Bodamer retrieved his AK-47 from the trunk of the car. The defendant instructed Martin to turn his car around and wait for them. Bodamer was wearing gloves, a dark coat or hoodie and made a further attempt to conceal his identity by putting a bandana around his forehead. The defendant asked Martin for a mask, which Martin did not have, and she then asked for Martin's hat, which Martin refused to provide. Thereafter, Bodamer and the defendant walked up Benedict Street and climbed the back stairs at 2 Benedict Street to Davis' apartment door located on the third floor landing. Their presence outside Davis' back door activated the outside lights that were on a motion sensor.

Hearing a knock at the back door, Davis' brother, Daniel Davis, Jr., who was visiting his sister, went to the door and asked who was there. The defendant replied: "It's the bitch." Having sold drugs to the defendant previously, Daniel Davis, Jr., recognized her voice and opened the door halfway. Daniel Davis, Jr., saw the defendant standing approximately three feet away

with Bodamer standing behind her. Bodamer then jumped out from behind the defendant with the AK-47, and Daniel Davis, Jr., kicked the door closed and locked it. Bodamer shouted, "open the door, motherfucker," before smashing out one of the kitchen windows, located beside the back door, with the butt of the AK-47. At this time, directly on the other side of the kitchen window, the siblings' father, Daniel Davis, Sr., and Timothy Dunn were seated at the kitchen table playing cards. Bodamer then stuck his AK-47 through the broken window into the apartment and fired two gunshots.

One of the gunshots struck and killed Daniel Davis, Sr. The other gunshot struck and injured Todd Hall, a friend of Daniel Davis, Sr., who had arrived moments earlier and was passing through the kitchen. Upon hearing the gunshots, Smykla and Martin decided to leave before Bodamer and the defendant could return to the vehicle; however, after driving away and taking two successive left turns, they encountered Bodamer in the middle of the street signaling them to stop. Bodamer and the defendant got into the backseat of Martin's car, and the four drove back toward Bristol.

The four drove past a police car heading the opposite direction back toward Benedict Street at a high rate of speed with its police lights activated. Bodamer stated that he had shot someone with his "infamous [AK-47]" and that the police car that had passed was because of him. Bodamer also said that he could not wait to read the morning newspaper. The defendant asked Bodamer who was shot and stated that if it was the person who had raped her, he deserved to be shot. Bodamer replied that he did not know who he had shot, and the defendant told him that no one had ever done anything like that for her. During the drive back to Bristol, the defendant was laughing, kissing and talking with Bodamer in the backseat.

Bodamer instructed Martin to drive to Bodamer's residence in Bristol, and once there, Bodamer dropped off the AK-47. Martin then dropped Smykla, Bodamer and the defendant at Smykla's apartment before he drove home. Back at Smykla's apartment, Bodamer and the defendant continued kissing and being intimate until Bodamer left sometime between 3 and 4 a.m. The defendant then began to cry and told Smykla that although what Bodamer did was the nicest thing anyone had ever done for her, she was unsure if the right person had died at the apartment. When Smykla woke up at noon the next day, he made the defendant leave his apartment.

That day, December 1, 2006, the defendant was arrested and later charged with conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (2), attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (2), felony murder in violation of § 53a-54c and assault in the first degree in violation of § 53a-59 (a) (5). After a jury trial, the defendant was found guilty of all charges and sentenced to a total effective term of fifty-five years incarceration. This appeal followed. Additional facts will be set forth where necessary.

I

The defendant first claims that the evidence adduced at trial was insufficient to support her conviction of (a) assault in the first degree in violation of § 53a-59 (a) (5) under a theory of *Pinkerton* liability and (b) felony murder in violation of § 53a-54c. Specifically, the defendant asserts that the evidence was insufficient to support her conviction of (1) assault in the first degree because the state failed to prove, beyond a reasonable doubt, that Bodamer committed the crime of assault in the first degree, and (2) assault in the first degree and felony murder because there was no evidence that the

gunshots fired by Bodamer were "in furtherance of" either the conspiracy or attempt to commit robbery in the first degree. We disagree.

We first set forth the well settled principles that govern our review. "Appellate analysis of [a sufficiency of the evidence claim] requires us to undertake a well defined, twofold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which

establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Monahan*, 125 Conn. App. 113, 118–19, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011). With these principles in mind, we turn to the defendant's conviction.

## A

The defendant argues that the evidence adduced at trial was insufficient to sustain her conviction of assault in the first degree in violation of § 53a-59 (a) (5) under the *Pinkerton* theory of vicarious liability because the state failed to prove, beyond a reasonable doubt, that Bodamer committed the crime of assault in the first degree. Pursuant to the *Pinkerton* doctrine of vicarious liability, articulated by the United States Supreme Court in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), and expressly adopted by our Supreme Court in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993), "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." (Internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 491, 820 A.2d 1024 (2003). Accordingly, for the defendant to be convicted of the crime of assault in the first degree under the *Pinkerton* doctrine of vicarious liability, the state was required to prove, beyond a reasonable doubt, that the crime of assault in the first degree was committed by the defendant's coconspirator, Bodamer.[3] See *State* v. *Martinez*, 278 Conn. 598, 618, 900 A.2d 485 (2006) ("under the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did not commit if the state can establish that a

---

[3] The defendant does not challenge the sufficiency of the evidence in establishing that she and Bodamer were coconspirators.

coconspirator did commit the crime" [internal quotation marks omitted]).

Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm." "Assault in the first degree is a specific intent crime." *State* v. *Holmes*, 75 Conn. App. 721, 736, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003). It requires that the criminal actor possess the specific intent to cause physical injury to another person. See id., 736–37; see also *Moore* v. *Commissioner of Correction*, 119 Conn. App. 530, 538 n.4, 988 A.2d 881, cert. denied, 296 Conn. 902, 991 A.2d 1103 (2010). The defendant argues that evidence of the requisite intent was lacking because the evidence established only that Bodamer fired "two wild shots" into the apartment having no idea who, if anyone, might be shot. We are not persuaded.

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Serrano*, 123 Conn. App. 530, 544, 1 A.3d 1277 (2010), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011).

After an examination of the record, we conclude that the state adduced sufficient evidence for the jury reasonably to conclude that Bodamer fired the gunshot, which hit Hall, with the intent to cause physical injury. At Smykla's apartment prior to the incident, Bodamer was overheard telling the defendant that he had an AK-47 that could be used to "get them" and that "it wouldn't be funny" once they got to Plymouth. Once in Plymouth, Bodamer concealed his identity and brought an AK-47 loaded with at least twelve bullets to the Davis apartment. See, e.g., *State* v. *Virgo*, 115 Conn. App. 786, 805, 974 A.2d 752 (intent to cause physical injury reasonably inferred from defendant's use of large caliber handgun capable of inflicting serious physical injury), cert. denied, 293 Conn. 923, 980 A.2d 914 (2009).

After having the door slammed on him, Bodamer yelled, "open the door, motherfucker," smashed the kitchen window and then thrust the gun into the kitchen. Thereafter, Bodamer fired two gunshots into the kitchen; one struck Hall in the chest causing significant physical injury, and the other struck Daniel Davis, Sr., in the abdomen causing death.[4] See *State* v. *Aviles*, 107 Conn. App. 209, 218, 944 A.2d 994 (intent to kill reasonably inferred where victim slammed door on defendant and defendant fired two gunshots into wooden door below peephole hitting victim in chest with one gunshot), cert. denied, 287 Conn. 922, 951 A.2d 570 (2008). Both victims were a short distance from the kitchen window. See *State* v. *Santos*, 41 Conn. App. 361, 371, 675 A.2d 930 (intent to kill reasonably inferred

[4] Daniel Davis, Jr., and Hall both heard gunshots before Daniel Davis, Sr., and Hall, who were both located in the kitchen, were struck by bullets. Medical examiner Ira Kanfer testified that the bullet that struck and killed Daniel Davis, Sr., entered the right side of his abdomen and exited the left side of his chest. Hall testified that the bullet that struck and injured him entered and exited the right side of his chest. Detective Peter Valentin of the state police testified that two fired bullets were recovered from inside the Davis apartment.

where deadly weapon used at close range and gunshot struck vital part of victim), cert. denied, 237 Conn. 932, 677 A.2d 1374 (1996).

Bodamer then immediately fled from the scene, and, in Martin's car after the incident, referenced having shot someone with his "infamous [AK-47]" and said that he "couldn't wait to read the morning [newspaper]." Even if we deem reasonable the defendant's assertion that the two gunshots Bodamer fired into the Davis kitchen were "random" or "wild," such an interpretation of the evidence was not the only reasonable one. See State v. Monahan, supra, 125 Conn. App. 119 ("[o]n appeal . . . [w]e ask . . . [if] there is a reasonable view of the evidence that supports the jury's verdict of guilt" [internal quotation marks omitted]). In sum, on the basis of the above evidence, the jury reasonably could have concluded that the gunshots fired were not wild or random, and Bodamer, with intent to cause physical injury, caused such injury by the discharge of a firearm.

B

The defendant next challenges her conviction of assault in the first degree in violation of § 53a-59 (a) (5) and felony murder in violation of § 53a-54c on the ground that the evidence was insufficient to show that the assault of Hall was committed "in furtherance of" the conspiracy to commit robbery, and that the fatal shooting of Daniel Davis, Sr., occurred "in furtherance of" the attempt to commit robbery. Specifically, the defendant argues that Bodamer fired the gunshots into the kitchen before the robbery actually had commenced and, therefore, the shootings did not advance the crime of conspiracy or attempt to commit robbery. We disagree.

As discussed previously, the defendant was convicted of assault in the first degree in violation of § 53a-59 (a)

(5) on the *Pinkerton* theory of vicarious liability, which dictates that "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are *in furtherance of it,* and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." (Emphasis added; internal quotation marks omitted.) *State* v. *Coltherst,* supra, 263 Conn. 491. Additionally, the defendant was convicted of felony murder pursuant to § 53a-54c, which provides, in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, [she] . . . attempts to commit robbery . . . and, in the course of and *in furtherance of* such crime or of flight therefrom, [she], or another participant, if any, causes the death of a person other than one of the participants . . . ."[5] (Emphasis added.) General Statutes § 53a-54c.

The defendant first argues that the gunshots fired by Bodamer did not "aid" or "advance" the conspiracy or the attempt to commit robbery, and, thus, could not have been "in furtherance of" either because the gunshots "did nothing to get the perpetrator(s) into the apartment . . . ." We are not persuaded by the defendant's favorable interpretation of the evidence, and we reject her constricted reading of "in furtherance of." "The case of *State* v. *Young,* [191 Conn. 636, 640–41, 469 A.2d 1189 (1983)], summarizes the history and purpose of the in furtherance phrase of § 53a-54c. . . . The defendant in *Young* argued that furtherance meant promotion or advancement and did not imply merely

---

[5] We note that to obtain a conviction of felony murder, "[t]he state must simply prove all the elements of the underlying felony and then prove that the deaths were in the course of and in the furtherance of that felony, or that the deaths were caused in flight from the commission of the felony. . . . The killing of a nonparticipant in the course of and in furtherance of [a felony] or of flight therefrom are two methods of committing the same crime." (Citation omitted; internal quotation marks omitted.) *In re Michael B.,* 36 Conn. App. 364, 372, 650 A.2d 1251 (1994).

a causal relationship between the underlying felony and the death. . . .

"In rejecting this argument, the *Young* court noted that Connecticut's penal code was taken from the New York code and deviates substantially from the recommended felony murder provisions of the Model Penal Code. . . . New York courts have construed the phrase in furtherance of to impose the requirement of a logical nexus between the felony and the homicide. Specifically, [m]ore than the mere coincidence to time and place . . . the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them. . . . Our Supreme Court agreed with the New York courts that the phrase in the furtherance of is intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact . . . [and] serves to exclude those murders that are committed during the course of an underlying felony but that are wholly unrelated . . . ." (Citations omitted; internal quotation marks omitted.) *In re Michael B.*, 36 Conn. App. 364, 374–75, 650 A.2d 1251 (1994). "Primarily its purpose was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances which were within the contemplation of the confederates to the undertaking . . . ." *State* v. *Young*, supra, 191 Conn. 642.

Thus, in *State* v. *Montgomery*, 254 Conn. 694, 732, 759 A.2d 995 (2000), our Supreme Court rejected the defendant's interpretation of "in furtherance of" in § 53a-54c to require the "promotion" or "advancement" of the underlying felony. In *Montgomery*, the defendant was charged with felony murder in relation to the death of the victim he had attempted to kidnap. Id. The defendant argued that the death of the victim could not have

been "in furtherance of" the attempted kidnapping because the victim was killed intentionally, and, therefore, any attempt to kidnap must have necessarily been abandoned prior to the killing. Id. Our Supreme Court rejected this argument, concluding that when a "defendant attempts to kidnap the victim at gunpoint, the jury reasonably may find that it was *within his contemplation* that the victim might be shot and killed . . . [and thus] the jury reasonably could have concluded that the murder occurred *in furtherance of* the attempted kidnapping." (Emphasis altered.) Id., 734.

In the present case, the jury was presented with sufficient evidence to find that it was within the defendant's contemplation that one or more of the people she intended to rob at gunpoint would be shot and injured or killed. The state presented evidence that on the evening of the incident, Brandy Davis had told the defendant over the telephone that if the defendant came to her apartment again she would kill the defendant. Brandy Davis testified that the defendant had been in her apartment the night prior to the incident and was in a position to see that there was a gun in the apartment. Thus, the jury reasonably could have concluded that the defendant was aware that she was likely to encounter armed resistance at the Davis apartment. Smykla testified that the defendant proposed a plan to go to the Davis apartment and rob the occupants of cocaine, and stated that it was revenge for her having been raped at the Davis apartment the night before. Bodamer was overheard telling the defendant that he had an AK-47 and "we can get them." In the aftermath of the shooting, the defendant twice said that what Bodamer did was the nicest thing anyone had ever done for her. On the basis of this evidence, the jury reasonably could have concluded that the crime of assault in the first degree was committed "in furtherance of" the conspiracy to commit robbery and that the death of Daniel Davis, Sr.,

occurred "in furtherance of" the attempt to commit robbery.

Additionally, we are not persuaded by the defendant's argument that the crime of attempted robbery had yet to commence when Bodamer fired the gunshots into the kitchen because he and the defendant had not yet entered the apartment. In *State* v. *Gayle*, 64 Conn. App. 596, 611, 781 A.2d 383, cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001), we emphatically rejected the defendant's claim that the victim of an attempted armed robbery was not shot "in the course of and in furtherance of" the attempted robbery because the victim had declined to relinquish his valuables, and, thus, the attempted robbery was completed by the time the victim was shot. We concluded that "[t]he defendant, in making his claim, ignores common sense and attempts to slice finely the series of events that transpired . . . characterizing them as distinct and wholly unrelated incidents." Id., 612.

Similarly, we reject the defendant's efforts to compartmentalize the series of events that transpired on the night of the incident into discrete and independent acts. The defendant and her coconspirators drove to Bodamer's residence to retrieve his AK-47, then drove to Plymouth. Bodamer then attempted to conceal his identity and, with the defendant, climbed up three flights of stairs to the Davis apartment door. The defendant then knocked on the door and responded to the occupant's question with her familiar nickname. When the door was opened, Bodamer jumped out from behind the defendant with the AK-47, and the door quickly was slammed shut. We need not decide precisely at which point in this series of events the attempted robbery commenced because we conclude that the jury was presented with sufficient evidence to determine that it was well under way by the time Bodamer fired the gunshots into the kitchen.

## II

The defendant next claims that the state committed reversible prosecutorial impropriety by (1) failing to enter into evidence written statements that the defendant had given to police upon her arrest, and (2) vouching for the credibility of the state's two key witnesses and stating during final argument to the jury that their incarceration was punishment for their role in the alleged crimes. We conclude that there was no prosecutorial impropriety.

We first set forth the legal principles that guide our analysis. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . [T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Souza*, 125 Conn. App. 529, 534, 8 A.3d 1131 (2010). With these principles in mind we turn to the defendant's claims of prosecutorial impropriety.

### A

The defendant first contends that the state committed reversible impropriety when the prosecutor failed to enter into evidence two statements she had given to police shortly after her arrest. Invoking the venerable rule that a prosecutor "is under a duty not solely to

obtain convictions but, more importantly . . . to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court"; (citations omitted; internal quotation marks omitted) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 556–57, 663 A.2d 317 (1995); the defendant argues that the failure to enter into evidence her statements was an act of prosecutorial impropriety. The defendant concedes that she did not raise this objection at trial. We review this claim pursuant to *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). Because we conclude that the duty identified by the defendant did not require the prosecutor to introduce the statements into evidence, we hold that the contested omission was not an act of prosecutorial impropriety.

The following additional facts are pertinent to our review of the defendant's claim. While investigating the shooting incident at 2 Benedict Street, Trooper William Arbour and Detective Walter Melfi of the state police determined the defendant to be a person of interest. Arbour and Melfi located the defendant on December 1, 2006, and promptly arrested her on two outstanding arrest warrants. After being read her *Miranda* rights,[6] the defendant agreed to waive them and orally responded to several questions during the ride to the Plymouth police department. The defendant told Arbour and Melfi that "she had met three men, one named Shawn. They drove around and went to a trailer park where Shawn got out of the car, went to a vehicle and removed something. They all then drove to an apartment where Shawn fired two . . . [gun]shots into a window."

At the police station, the defendant provided a written statement. In that statement the defendant admitted to

[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

being at the scene of the shooting but claimed that she had participated in the failed robbery under duress. The defendant stated that Bodamer had assaulted her in the back of Martin's car after she had refused his demand for oral sex and then, once they arrived at the Davis apartment, he dragged her up the stairs to the back door while pointing the AK-47 into her back. The defendant also stated that Bodamer made her knock on the door and that once it was slammed in her face, Bodamer pinned her against the door and then fired two gunshots into the apartment before he pushed her down the stairs and back into Martin's car.

Prior to trial, the defendant filed a motion to suppress from evidence all statements, whether oral or written, made by the defendant to the police, which the court denied.[7] Thereafter, the defendant filed a request to charge on the defense of duress pursuant to General Statutes § 53a-14.[8] Consequently, at trial, the state elicited testimony from Smykla, Martin, Samantha Morgan and Tiffany Labombard to establish that the defendant was in the company of Smykla, Martin and Bodamer of her own volition, was not threatened and did not appear scared on the night of November 30, 2006.[9] The

---

[7] At the hearing on the defendant's motion and in response to a question posed by the court, the state informed the court that it did not intend to introduce into evidence either the oral or written statements as part of its case-in-chief.

[8] General Statutes § 53a-14 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

[9] On direct examination, Smykla testified that the defendant and Bodamer, who were kissing, touching and being intimate with one another, both tried to convince Martin to drive them to Plymouth while at Smykla's apartment. Smykla further testified that the defendant and Bodamer were "making out" in the back of Martin's car on the way to Plymouth and that there was no arguing or fighting. Similarly, Martin testified that at Smykla's apartment

defendant cross-examined Smykla and Martin and unsuccessfully tried to elicit evidence that she had been coerced into participating in the failed robbery. The state did not introduce the defendant's statements into evidence, and after the state rested its case, the defendant rested without presenting any evidence.

As a preliminary matter, we note that the defendant does not claim, nor could she, that the state failed to disclose exculpatory evidence to her in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Rather, the defendant begins with the premise that a prosecutor is under an ethical duty "to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty." *State* v. *Moynahan*, 164 Conn. 560, 568, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). The defendant next posits that both the oral and written statements she gave to police shortly after her arrest revealed that the "true issue" in the case was whether her participation in the failed robbery was caused by duress. Thus, the defendant argues, because she was unable to introduce the statements herself, the state's failure to do so was a violation of its ethical duty, and, consequently, an act of reversible impropriety. We disagree.

Resolution of the defendant's claim is controlled by *State* v. *Tomas D.*, 296 Conn. 476, 509–10, 995 A.2d 583 (2010). In *Tomas D.*, the defendant appealed his

the defendant sat on Bodamer's lap kissing and hugging him, and that they both pressured him into driving them to Plymouth. Martin further testified that on the way back from Plymouth after the shooting the defendant sat in the backseat laughing with Bodamer. Labombard testified that she saw the defendant laughing, joking and flirting while at Smykla's apartment and that the defendant did not appear afraid. Finally, Morgan testified that while at Smykla's apartment that evening, she saw the defendant petting Bodamer's arm and that the defendant did not appear to be struggling with anyone.

conviction and claimed that the prosecutor committed prosecutorial impropriety at trial by failing to inform him that she had released a key state's witness from his subpoena, causing the witness to become unavailable to testify to potentially exculpatory evidence and thereby failing in the prosecutor's duty to place " 'the truth before the jury.' "[10] Id., 510. To support her argument, the defendant cited to *State* v. *Guilfoyle*, 109 Conn. 124, 134, 145 A. 761 (1929), for the proposition that "the duty of the representative of the [s]tate dictates that the testimony of every available witness tending to aid in ascertaining the truth as to facts relevant to the inquiry be laid before the trial court . . . ." Id.

Our Supreme Court concluded that "subsequent case law has made clear that *the Guilfoyle rule is one of disclosure*, akin to that of *Brady* v. *Maryland*, [supra, 373 U.S. 83], and that there was no *Guilfoyle* violation because the defendant was aware of [the key witness] and the potential substance of his testimony, and could have taken action to procure his testimony." (Emphasis added.) *State* v. *Tomas D.*, supra, 296 Conn. 510; see also *State* v. *Johnson*, 57 Conn. App. 156, 162, 748 A.2d 334 (state fully complied with *Guilfoyle* rule where information disclosed to defendant without being offered into evidence), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000).

The defendant attempts to distinguish this line of precedent by arguing that the statements, which revealed that the true issue in the case was whether she was under duress, could only have been introduced

---

[10] It is notable that after his conviction, the defendant's motion for a judgment of acquittal was denied, in which he alleged that "the state improperly had failed to . . . introduce the defendant's oral and written statements made during the course of the police investigation, thus forcing him either to testify or keep the jury from receiving those potentially material statements . . . ." *State* v. *Tomas D.*, supra, 296 Conn. 483 n.13. This claim, however, was not presented on appeal. Id.

into evidence by the state. See *State* v. *Jackson*, 257 Conn. 198, 211–12, 777 A.2d 591 (2001) (balance of written statement defendant gave to police was inadmissible hearsay when defendant sought to offer it into evidence). The defendant, however, seeks to shift the initial burden of production in the defense of duress. General Statutes § 53a-12 (a) provides that "[w]hen a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt."[11] Thus, the state's burden of persuasion—to disprove duress beyond a reasonable doubt—does not attach until duress is first "raised at trial" by the defendant. See *State* v. *Cassino*, 188 Conn. 237, 241–44, 449 A.2d 154 (1982); see also *State* v. *Pierson*, 201 Conn. 211, 217, 514 A.2d 724 (1986) ("[t]hough the state bears the burden of disproving the [defense of duress] once . . . raised *by the presentation of some evidence supporting* [*it*], there is no requirement that evidence negating [it] be produced as part of the state's prima facie case" [emphasis added]), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989).

Moreover, in our system of criminal justice, "built upon a truly equal and adverse presentation of the case," a criminal defendant is granted effective control over the conduct of her defense because it is she who must suffer the consequences of its failure. *State* v. *Peeler*, 265 Conn. 460, 470–72, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004). At trial, the defendant unsuccessfully attempted to produce evidence of duress through cross-examination of the state's witnesses. After the state had rested, the defendant could have taken the witness stand and testified to the circumstances she had

[11] Duress is not an affirmative defense. *State* v. *Rouleau*, 204 Conn. 240, 242, 528 A.2d 343 (1987).

recounted in her statements to the police, but, presumably, she made a strategic decision not to do so. "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow." (Internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 233, 856 A.2d 917 (2004). To impose a duty on the prosecutor to offer the defendant's statements into evidence to establish the defense of duress would be inconsistent with the defendant's constitutionally guaranteed right to devise and control the manner of her own defense and the attendant burden of production as to the defense of duress. Accordingly, we conclude that the state's failure to introduce the defendant's statements into evidence was not an act of prosecutorial impropriety.

B

We turn to the defendant's final claim that the state committed prosecutorial impropriety during final argument to the jury. Specifically, the defendant first argues that it was improper for the prosecutor to state to the jury that Smykla and Martin would benefit from giving their testimony only if they told the truth. The defendant also argues that a second act of prosecutorial impropriety occurred when the prosecutor told the jury that Smykla and Martin were in prison and being punished for what they had done, when, in actuality, the two had not yet been convicted for their role in the failed robbery. The defendant asserts that these two acts of impropriety so infected the jury with prejudice that a new trial is required. We conclude that the prosecutor's remarks were not improper.

The following additional facts are germane to our analysis of the defendant's claim. During final argument to the jury, the prosecutor stated: "Now, the state called a number of witnesses to the [witness] stand, not just

Mr. Smykla and Mr. Martin, but obviously they were significant witnesses, and I want to talk about their testimony. As you heard, they've been arrested and they're in prison and they're facing a number of charges, and there have been no promises made to them as to what's going to happen to their cases and they were candid with you when they said it was their hope by coming and testifying and telling you about what happened that night that they would get favorable treatment but that no promises had been made. *And if that was their intent, let me ask you this: What was more likely to get them what they wanted? Was it to take the stand, raise their right hand and lie to you, lie in a court of law under oath, or was it to come in court and tell you what happened, to tell you the truth?*

"And let's take a moment [and look] at what they did tell you during the course of their testimony. They testified that they were in a plan to commit a robbery. . . . They didn't tell you, I'm innocent. They didn't say to you, I had nothing to do with it. They didn't say, I thought we were there just to buy drugs. They didn't say, I was forced into doing this. They said, we wanted cocaine. We wanted cocaine, and this was a way for us to get it. And I submit to you [that] by testifying as they did, they, in effect, *admitted that they were part of this conspiracy to commit a robbery, by their testimony they admitted that they were part of this attempt to commit a robbery, and they were involved in a felony that turned out to be felony murder and also assault in the first degree.*" (Emphasis added.) Then, in concluding, the prosecutor stated: "Ladies and gentlemen, all four of these individuals, in one degree or another, are responsible for what happened. *As you've heard, Mr. Martin and Mr. Smykla are in prison. They're paying for what their responsibility was in this case.*" (Emphasis added.)

"In determining whether an impropriety has occurred in closing arguments, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper." (Internal quotation marks omitted.) *State* v. *Felix*, 111 Conn. App. 801, 807, 961 A.2d 458 (2008).

With respect to the state's first remark, our Supreme Court "previously has concluded that the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie." (Citation omitted.) *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006). "A prosecutor may urge the jury to find for stated reasons that a witness was truthful or untruthful. . . . A prosecutor may also remark on the motives that a witness may have to lie, or not to lie, as the case may be. . . . The distinguishing characteristic of impropriety in this circumstance is whether the prosecutor asks the jury to believe the testimony of the state's witnesses because the state thinks it is true, on the one hand, or whether the prosecutor asks the jury to believe it because logic reasonably thus dictates." (Citations omitted; internal quotation marks omitted.) *State* v. *Felix*, supra, 111 Conn. App. 811–12.

In the present case, the prosecutor pointed out that the witnesses were themselves facing charges in connection with the shooting and that they were testifying

in the hopes of receiving more favorable treatment by the state in their respective cases. By rhetorical device, the prosecutor, without vouching for the veracity of the witnesses, then asked the jury to use its common sense and decide whether it was "more likely" that the witnesses were being truthful or lying. We previously have found no impropriety under similar circumstances. See, e.g., *State* v. *Jose G.*, 102 Conn. App. 748, 761–62, 929 A.2d 324 (2007) (not improper for prosecution to ask: " 'What motive did [they] have to come in here and make that up?' " and, " 'What possible bias or motive did the police have for fabricating this?' "), aff'd, 290 Conn. 331, 963 A.2d 42 (2009); *State* v. *Felix*, supra, 111 Conn. App. 811 n.8 (not improper for state to tell jury that cooperation agreements were not motive for witnesses' statements).

With respect to the state's second contested remark, the defendant's claim is without merit. The defendant argues that by stating, "I submit to you [that] by testifying as they did, they, in effect, admitted that they were part of this conspiracy to commit a robbery, by their testimony they admitted that they were part of this attempt to commit a robbery, and they were involved in a felony that turned out to be felony murder and also assault in the first degree," the prosecutor intended to mislead the jury into believing that Smykla and Martin had admitted guilt to the same four crimes with which the defendant had been charged. Furthermore, the defendant argues that the prosecutor's remark that Smykla and Martin were "paying for what their responsibility was in this case" was designed to mislead the jury into believing that they already were being punished by their incarceration at the time of trial. After reviewing the prosecutor's statement in context, however, we disagree.

Initially, we note the lack of any evidence of "intent to mislead" on the part of the prosecutor. The prosecutor first informed the jury that Smykla and Martin were

"in prison and they're facing a number of charges," and had testified in the hope of getting favorable treatment but that no promises had been made with respect to what would happen to their respective cases. Then, the prosecutor summarized the testimony given by Smykla and Martin and remarked that they, by virtue of the substance of their testimony, had admitted that they were "part of" and "involved in," rather than admitting guilt to, the same crimes charged against the defendant. This point was enforced by the prosecutor's statement that "all four of these individuals [Smykla, Martin, Bodamer and the defendant], in *one degree or another*, are responsible for what happened." (Emphasis added.) Finally, the prosecutor stated that Smykla and Martin were in prison and "paying for what their responsibility was in this case." The prosecutor did not imply that Smykla and Martin had admitted guilt to the same four crimes the defendant faced; rather, he explicitly stated that the individuals involved had differing degrees of culpability for what happened and that Smykla and Martin had admitted to actively participating in the crimes with which the defendant had been charged. Nor did the prosecutor's remarks imply that Smykla's and Martin's incarceration at the time of trial was punishment for the same four crimes with which the defendant had been charged; rather, the prosecutor told the jury that the two were incarcerated while facing charges, and, by admitting to having participated in the crimes with which the defendant had been charged, they were taking responsibility.

The judgment is affirmed.

In this opinion the other judges concurred.